[Crim. No. 3501.   Third Dist.   Aug. 14, 1964.]

THE PEOPLE, Plaintiff and Respondent, v. ROSE MARIE JOHNSON et al., Defendants and Appellants.

Charles Y. Boeggeman and S. Carter McMorris, under appointment by the District Court of Appeal, and Peter Heintz for Defendants and Appellants.

Stanley Mosk, Attorney General, and Doris H. Maier, Assistant Attorney General, for Plaintiff and Respondent.

MOOR, J. pro tem.*—A jury found defendants guilty of three counts each of the violation of Penal Code section 470 (the alteration of and passing three ''Bondified'' money orders). Imposition of sentence was suspended for both defendants and each placed on probation for three years, sub-

---

*Assigned by Chairman of Judicial Council.

ject to the usual conditions and one year in the county jail. Both defendants appeal from the judgment and order.

An examination of the entire record of this case convinces us that prejudicial error has occurred requiring reversal. For the delineation of these errors it is necessary to set out in detail pertinent portions of the testimony.

Mrs. Goldie Etheridge, cashier and sales clerk at the Manor Five and Ten store in Sacramento, testified that in the first week of December 1962 she sold three money orders, each for the sum of $1.00, to defendant Rose Marie. Defendant Moore was with her at the time. Mrs. Etheridge positively identified defendants as the persons who purchased the money orders; she remembered them because it was unusual to purchase money orders in the amount of $1.00, and they had been in before for money orders for the same amount. At a later time they had attempted to purchase four more money orders but left when Mrs. Etheridge asked them ''to put their name and address on them.''

Each money order is numbered and consists of an original and two copies. When issued the original and two copies are inserted in a check-writing machine at the same time. The amount and the issuing agency's number are stamped on the original and the copies. The white, or first copy, is then retained by the agency to be forwarded to the Travelers Express Company; the original and second copy (yellow) are given to the purchaser. The original is negotiable and passed for the amount indicated on its face. The party honoring the money order returns the original to the office of Travelers Express Company. If Travelers Express notices a discrepancy between the white copy received and the original, it will refuse payment.

In the instant case Mrs. Etheridge issued the three consecutive money orders, each for $1.00, to defendants. The white copies sent to Travelers Express so confirmed the amount. The original money orders when received by Travelers Express had been raised to the amounts of $146, $146 and $148.

Officers from three banks in Oroville testified they had cashed the money orders payable to ''Mary Mitchel'' on December 7, 1962. One of the officers, William Woolridge, further testified that he recalled the incident of the person who came in and presented the money order and who identified herself as Mary Mitchel, using a temporary driver's license for identification. He was able to describe this woman but no attempt was made to have him identify Ola Mae Kemp as that person.

Ola Mae Kemp, determined by the Court to be an accomplice as a matter of law, testified that Clevester Rhoden introduced her to defendants on December 6, 1962; that on December 7th she accompanied defendants and Rhoden on a trip from Stockton to Oroville; that on the way they made two stops in Sacramento. After the first stop Moore gave her a driver's license; at the second stop Moore took the license in and changed the information as to the color of eyes from green to brown. They thereafter drove to Oroville. In Oroville they stopped at a bank; Moore gave her a money order for $146; she filled it in from ''Robert Mitchel'' to ''Mary Mitchel'' as Moore had directed, and then took it into the bank where it was cashed upon showing her identification (the driver's license). When she returned she gave the money to Rose Marie, who then gave it to Moore. After making stops at two other banks, where the same procedure was followed, they drove to a service station and there Moore took out the money—giving himself, Rose Marie and her each a third. Moore and she then each gave Rhoden $30. Ola Mae identified the three original money orders as those she filled in and passed at the banks in Oroville.

Clevester Rhoden's testimony was essentially the same as Ola Mae's testimony. Although he denied any complicity or participation, he admitted that he had received $60 of the proceeds from the cashed money orders, believing it was given to him as a ''friend.'' He knew that the purpose of the trip to Oroville was to pass some raised money orders.

This was the factual situation at the close of the People's case in chief.

The defense then called a witness, Harry Allen, who testified that he was presently confined in the San Joaquin County Jail as the result of a conviction of the crime of forgery. He said that he only casually knew defendant Moore and defendant Rose Marie Johnson through meeting them at the Elk Café in the Elk's Club in Stockton where he was operating the café, and that he knew Clevester Rhoden and testified as follows: ''Q. [Mr. McMorris, counsel for defendant Moore] In what capacity do you know Mr. Rhoden? A. Well, he is my crime partner, he was in with me on the case I am here, I am serving time on now. Q. You say he was your crime partner, is that right? A. Yes. . . . Q. Now, will you explain for the Ladies and Gentlemen of the Jury what you mean by that term? A. Well, he and I committed the same crime. Q. The crime for which you are now serving

time? A. Yes." The witness then testified that Rhoden gave him four or five money orders and he, together with Rhoden and a Johnnie Midget (using Midget's automobile), went out to cash the checks. They were arrested after cashing the four or five money orders. The term of imprisonment which the witness was serving was the result of these acts. It was brought out that Rhoden, although arrested with the witness, was the only one of the three not convicted.

Undoubtedly, the purpose of the defense in introducing this witness was to impeach the testimony of Rhoden and to strengthen the case against him as an accomplice. However, during the course of the direct examination of this witness, defendants' counsel improperly inquired of him whether or not he, the witness, had ever participated in check-cashing activities with either of the two defendants in the case, to which he replied, "No;" or if he knew them to have been engaged in check-cashing activities with anyone else, to which he again replied in the negative.

On cross-examination of the witness the prosecution asked the following questions without objection by counsel for defendants: "Q. Did Mr. Moore, the defendant here, ever approach you with respect to passing money orders or checks? A. Well, no. Q. Did he ever discuss money orders or checks with you? A. No, we haven't. . . . Q. Has Miss Kemp ever approached you with respect to passing money orders? A. No, she haven't [sic]. Q. Has the defendant Miss Johnson here ever approached you with respect to passing any money orders or checks? A. No." He was then asked whether on the day before he had a conversation with Sergeant Harrison of the San Joaquin County Sheriff's Office in the Oroville Jail about defendant Moore's passing altered money orders or checks. He denied that he did. He was then asked if on Tuesday, January 15, 1963, he had made a statement to Sergeant Harrison in regard to having been previously approached by Moore and discussing with him the passing of altered money orders or checks, to which the witness answered: "I would like to know this, what does this have to do with this case? MR. DAVIS: We are asking the question, Your Honor, and we would like the witness to answer it. THE COURT: You will answer the question, Mr. Allen. THE WITNESS: I mean I feel like this, I refuse to answer on the ground that I feel what he is asking me will incriminate me in this case." Whereupon the court ruled that the witness did not have to answer the question. The witness was then

asked the following questions: "MR. DAVIS: Q. Mr. Allen, has Mr. Moore ever shown to you any money orders? A. No, not that I know of. Q. Has Mr. Moore ever shown to you an envelope? A. Yes, I have seen—he showed me an envelope. . . . Q. Did he say they were money orders in the envelope? A. No. Q. Do you deny that? A. Yes. . . . Q. Did Mr. Moore make the statement to you he could hit for big money? A. No, I can't say that he did. Q. Do you recall any statement that he made similar to that? A. No. Q. Do you deny making the statement to, as I have mentioned, Sergeant Harrison at the aforementioned place at the time previously indicated that Mr. Moore had made a statement to you to the effect that with the money orders in the envelope which he had shown you, he could make big money? A. No."

Rose Marie Johnson, testifying on her own behalf, denied that she had ever been in the Manor Five and Ten; that she had ever purchased any money orders; or that she had ever seen any money orders. She claimed that the sole purpose of the trip to Oroville was to accommodate Rhoden and Ola Mae. Initially, to an investigation officer, she had denied making the trip to Oroville, telling him that she had not been to Oroville for 12 years.

Defendant Moore did not take the stand.

The defense rested and the prosecution in rebuttal called the witness Allen and asked the following questions on direct examination: "MR. DAVIS: Q. On your previous testimony this morning, Mr. Allen, there were a couple of questions which were addressed to you concerning a certain statement made by you to Sergeant Harrison of the San Joaquin County Police Department, concerning whether or not Mr. Ledell Moore had approached you concerning the passing of altered money orders or checks, and you stated at that time, no, that he had not. Are you denying that you ever stated to Sergeant Harrison that he had so approached you, do you wish to change your testimony at this time?" An objection was made that this was not proper rebuttal; the objection was sustained and the witness left the stand. No admonition to the jury to disregard the nature of the question was requested nor was any such admonition given.

Sergeant Harrison then testified to the following conversation with Allen which was alleged to have occurred January 15, 1963: "Mr. Allen stated that while he was employed as a cook at the Elk's Club in Stockton, during the month of October and November, Ledell Moore had approached him on

numerous occasions, that Ledell Moore along with another party had talked with him about money orders, stolen payroll checks, and had approached him with the idea of passing these money orders. He stated further that Moore along at various times with Mrs. Johnson and this third party had more or less flaunted money in front of him, that he being a cook, and making so much. . . . [T]hey more or less taunted him with this fact that they had occasion to make a large amount of money and they wanted him to join them in passing these money orders and checks. . . . Mr. Allen stated on several occasions Rose Johnson and Ledell Moore along with this third party, had contacted him, at different times they had approached the idea of him passing money orders. He stated on one occasion Ledell Moore along with Rose Johnson and the third party had approached him, brought up the idea of him passing money orders and that he asked him where these money orders were. . . . He stated that Ledell Moore pulled an envelope from his pocket and made the statement that 'They are here.' 'I have the money orders.' . . .'' Allen also had stated that he was approached by Clevester Rhoden, who was the third party referred to, concerning the passing of checks, and who had later introduced him to Ledell Moore.

Harrison further testified that he had talked to Allen in the Butte County Jail the day before the day on which this witness was testifying, and Allen reiterated the statements he allegedly made on January 15. No tape recording or shorthand reporter's notes of the alleged statement by Allen were produced, although Harrison stated that the court reporter was present and took down the statements made by Allen on January 15, 1963.

The initial improper questions asked of Allen by defendants' counsel regarding the past criminal activities of defendants were used by the district attorney as justification for a calculated course of conduct whereby testimony highly prejudicial to the defendants, and not having the dignity of competent evidence, was introduced into the case.

This prejudicial misconduct on the part of the district attorney commenced with his cross-examination of Allen when he asked him such questions as to whether he had a conversation with Sergeant Harrison about defendant Moore's passing altered money orders or checks, whether Moore had ever shown him any money orders, and whether or not Moore had said to him that he could hit for big money. To each of the questions in this line of questioning the witness answered "no" or denied the statement contained in the question.

The second step in the series of errors occurred when the district attorney called Allen as his own witness on rebuttal and attempted to impeach him by asking whether he denied making these statements to Sergeant Harrison, which question included all of the elements of the purported statement of witness Allen to Harrison.

This court can find no justification for the actions of the district attorney in calling Allen as his own witness and attempting to impeach him by loading the impeaching questions with prejudicial material.

The prejudicial misconduct culminated when the prosecution had Sergeant Harrison relate the purported statements Allen made concerning what defendant Moore had said to him at some remote and uncertain time, which included criminal activities of both defendants that were not related to the present charges. This testimony was offered by the prosecution on a theory of impeachment of Allen and his denial that on January 15, 1963, and on April 4, 1963, he had made certain statements to Sergeant Harrison concerning the defendants. Here, under the guise of impeachment, was clearly a successful attempt to get before the jury conduct from which the jury could believe that if defendants had at some prior time altered and passed money orders or checks, in all probability, they were guilty of the present offense.

▬ To show a witness to be untrustworthy, evidence may be introduced of prior inconsistent statements or contradictory evidence, or that he had been convicted of a felony, or that his general reputation for truth, honesty or integrity is bad. (Witkin, Cal. Evidence, §§ 651, 655, 661, 672.)

▬ It is not, however, within the proper scope of impeachment to show that a witness has given false testimony as to a matter which could not be proved independently in the case. (*People* v. *Wells,* 33 Cal.2d 330 [202 P.2d 53]; *People* v. *Vanderburg,* 184 Cal.App.2d 33 [7 Cal.Rptr. 287].)

▬ Other acts of criminality cannot be introduced into the case for the purpose of arousing an atmosphere of prejudice against the defendant or to create a probability of his guilt of the charge of which he is on trial. (*People* v. *Baylor,* 47 Cal.App.2d 34 [117 P.2d 425].)

▬ In *People* v. *Arends,* 155 Cal.App.2d 496, this court said at pages 508-509 [318 P.2d 532] : " [T]he argument that appellant's counsel 'opened the gates' is unavailing. As was said by this court in *People* v. *McDaniel,* 59 Cal.App.2d 672, 677 [140 P.2d 88], 'An error that is prejudicial is no less so

because it results from a lack of knowledge on the part of either counsel or both. ▇ Legitimate cross-examination does not extend to matters improperly admitted on direct examination. Failure to object to improper questions on direct examination may not be taken advantage of on cross-examination to elicit immaterial or irrelevant testimony. The so-called "open the gates" argument is a popular fallacy. ▇ "Questions designed to elicit testimony which is irrelevant to any issue in the case on trial should be excluded by the judge, even though opposing counsel has been allowed, without objection, to introduce evidence upon the subject." (27 Cal.Jur. p. 74.) ▇▇ "It is a settled rule that cross-examination as to matters irrelevant to the issue may and should be excluded—even though, in some cases, testimony relative thereto was elicited upon direct examination—and that a party may not, under the guise of cross-examination, introduce evidence that is not competent within the meaning of established rules." (27 Cal.Jur. p. 106.)' ▇ The same rule applies to incompetent evidence elicited 'under the guise' of redirect examination. ▇ While a prosecuting officer may use every legitimate means to bring about a just conviction, it is just as much his duty to refrain from improper methods calculated to produce a wrongful conviction (*Viereck* v. *United States,* 318 U.S. 236, 247-248 [63 S.Ct. 561, 87 L.Ed. 734, 741])."

▇ Nor can we say that the error here committed was cured by cautionary instructions which included the following: ". . . Therefore, you are instructed that you shall not consider Sergeant Harrison's testimony in reference to the guilt or innocence of the defendant except only insofar as it may or may not affect the credibility of the witness Harry Allen."

"This defect in the trial was not cured by the court's striking the evidence and admonishing the jury to disregard it. Ordinarily the admission of incompetent evidence cannot be cured by striking it and instructing the jury to disregard it when it goes to a main issue of the case and when other evidence of guilt is not clear and convincing. (*People* v. *Hardy,* 33 Cal.2d 52, 61-62 [198 P.2d 865]; *People* v. *Roof,* 216 Cal.App.2d 222, 226-227 [30 Cal.Rptr. 619.) . . ." (*People* v. *Matteson,* 61 Cal.2d 466, at pp. 469-470 [39 Cal. Rptr. 1, 393 P.2d 161].)

The court erred in not instructing the jury that Clevester Rhoden was an accomplice as a matter of law in the same manner in which they were instructed with regard to the

testimony of Ola Mae Kemp. (*People* v. *Dailey,* 179 Cal.App. 2d 482 [3 Cal.Rptr. 852].) Rhoden introduced Ola Mae Kemp to the defendants; he arranged for the trip to Oroville, paid for the gasoline on the trip, knew what the purpose of the trip was, and participated at the scene in the division of the illegally obtained money. His actions in this case were similar to his actions in the case involving Johnnie Midget and the witness Allen in Stockton.

In view of such uncontradicted facts, there can be no question that Rhoden's testimony comes within the provisions of section 1111 and section 31 of the Penal Code and that he was an accomplice as a matter of law. It is true that the court left the determination of the question of whether Rhoden was an accomplice to the jury and instructed them that if they determined him to be an accomplice, his testimony must be corroborated. Therefore, since the jury may have determined that Rhoden was not an accomplice and may therefore have concluded that his testimony sufficiently corroborated the testimony given by Ola Mae Kemp, the case against the defendants becomes one which presents a minimal evidentiary framework in support of the judgment. Where, as here, the case is closely balanced and guilt has not been so clearly established so as to render it improbable that the harmful effect of the misconduct may have turned the scales against the accused, such misconduct has consistently been deemed grounds for reversal. (*People* v. *Perez,* 58 Cal.2d 229 [23 Cal. Rptr. 569, 373 P.2d 617]; *People* v. *Ford,* 89 Cal.App.2d 467 [200 P.2d 867].)

The course of conduct on the part of the district attorney was improper and peculiarly calculated to prejudice the substantial rights of the accused to that fair and impartial trial to which, whether innocent or guilty, they are entitled. It leaves this court in a position from the reading of the entire record where it must say that the errors and the misconduct of the district attorney resulted in a miscarriage of justice and that the interests of justice require that a new trial be had.

The judgment of conviction of violation of Penal Code section 470 of both defendants is reversed.

Pierce, P. J., and Friedman, J., concurred.