[Crim. No. 14995. In Bank. May 5, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
LAWRENCE EARL LAVERGNE, Defendant and Appellant.

736

**COUNSEL**

Lawrence Earl Lavergne, in pro. per., Don Edgar Burris, under appointment by the Supreme Court, and Joe Reichmann, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch and Evelle J. Younger, Attorneys General, William E. James, Assistant Attorney General, and Marilyn Mayer Moffett, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**PETERS, J.**—Defendant, Lawrence Earl Lavergne, was found guilty by a jury of two counts of first degree robbery of a men's clothing store. (Pen. Code, § 211.) He was acquitted on two other counts involving robbery of a supermarket. He contends that the trial court improperly denied him the right to impeach the testimony of his accomplice in the clothing store robbery.[1] He also argues that the prosecutor knowingly used perjured testimony and that the trial judge was biased against him.

On September 16, 1968, about 3 o'clock in the afternoon, four men robbed Ed Burke's Men's Clothing Store in Los Angeles. Three of them, James Oliver, Michael Blaylock and Willie Hodby, were arrested and pleaded guilty.

Two employees of Ed Burke's Men's Clothing Store, Nellicks and Johnson, were present during the robbery and testified at trial. Each separately picked Lavergne at the lineup as one of the robbers and identified him at the preliminary hearing. Both also identified him at the trial.

At the time of the robbery Nellicks was standing behind and Johnson near the counter where the cash register was located. They both testified that Lavergne appeared at the counter with a handgun and marched them to the stockroom at the back of the store. The other three robbers then appeared although neither Nellicks nor Johnson was sure whether they entered through the back or front door. Two of the three were also armed with handguns.

Nellicks testified that Lavergne and Oliver ordered him back to the cash register at the counter and ordered him to open it. Lavergne removed the money. He also took Nellicks' watch and ring. Nellicks and Johnson were held in the stockroom for about 10 minutes while the robbers carried four or five thousand dollars worth of clothing out the back door of the store. When asked to describe Lavergne as he remembered him during the robbery, Nellicks testified that he was short and "slender built," 5 feet 6 to 7 and 130 or 135 pounds. According to the police report the description

---

[1]Defendant's contention that the attorney who represented him before the Court of Appeal was incompetent is moot since we transferred his appeal to this court and appointed different counsel.

he gave to the police following the robbery was of a 20- to 24-year-old male, 5 feet 9, 150 to 160 pounds. Nellicks testified that he had seen Hodby, Oliver and Blaylock, but not Lavergne, in the store for about 15 minutes the morning of the robbery. He stated that he had no doubt that Lavergne was one of the robbers.

Johnson testified that Lavergne took his watch and ring. He also testified that he remembered Lavergne on the day of the robbery as being 5 feet 6 or 7 inches, and 140 pounds. His police record description was not used to refresh his memory, apparently because his testimony substantially conformed to the report.

Oliver testified that he was permitted to plead guilty to second degree robbery in exchange for his testimony. He said that he first met Lavergne on the day of the robbery around 12:30. (He had known the other two robbers for 10 or 11 years.) He was driving around in his car accompanied by Blaylock. They stopped to talk to Lavergne on the street. Blaylock introduced Lavergne to Oliver. Blaylock and Oliver then went to Hodby's house. The three later met with Lavergne again, at which time Oliver brought up the idea of committing a robbery.

Oliver was vague about the source of the guns used in the robbery but declared that he himself never carried one. He said that the gun Lavergne carried was taken from Blaylock's car. Although his testimony was somewhat confusing he appeared to deny that he or Blaylock or Hodby carried guns during the robbery. (Nellicks and Johnson testified that three of the men were armed.)

Oliver drove his car, with Blaylock and Hodby as passengers, and parked a "couple of blocks" from Burke's Clothing Store. Lavergne drove his car and parked it around the back of the store. Hodby entered the store, then Lavergne, then Blaylock and Oliver. The clothing was loaded into Lavergne's car at the back of the store. Lavergne took the stolen property to Blaylock's house where he was met by Oliver, Blaylock and Hodby. There they divided the clothing between them. Oliver said he left before Lavergne took his share. Oliver's testimony concerning the course of the robbery inside the store conformed substantially to that of Nellicks and Johnson.

Lavergne testified in his own defense. He stated that he did not commit the clothing store robbery. The first time he saw either Willie Hodby or James Oliver was in court after the robbery, although he later stated that he had known Willie Hodby's brother, Roger, two or three months before his arrest. He met Blaylock in the latter part of September, after the clothing store robbery and before he was arrested, when Blaylock's fiancée

introduced them at a bowling alley.[2] Blaylock's fiancée lived down the street from him and he had known her for a year. He was arrested on September 30 when he took Blaylock's fiancée to the police station to pick up Blaylock's car keys and take him cigarettes. When asked his name at the police station, he gave an alias.

Lavergne testified that at 3 p.m. on Monday, September 16, the time of the robbery, he was at his sister's house in San Diego. He and a friend, Patricia Martin, left for San Diego in his 1961 Thunderbird "Saturday night about 1:00." He brought Patricia Martin back between 5 and 6 p.m. on Sunday so that she could be at work the next day. Around 9 a.m. Monday morning he headed back for San Diego to attend a going-away party for his sister. He stayed until Wednesday. He stated a number of sisters and nieces attended the party and one sister's boyfriend. He also testified that he bought his Thunderbird in early September and that it had been recently impounded because he did not make his payments.

Patricia Martin testified that on a Saturday night "in the middle part" of 1968 she had gone with Lavergne to his sister's house in San Diego and that they returned on Sunday after 4. She returned so that she could go to work the next day. She stated that she had not worked since June of 1968 which would fix the date of the San Diego trip three months earlier than the robbery. She did, however, say that they made the trip in Lavergne's blue Thunderbird, which he testified he bought in September.

Lavergne's sister Lucille Carter testified that Lavergne had come to San Diego on Saturday, September 14, with a girl whose name she could not remember, returned to Los Angeles on Sunday, was back in San Diego Monday before sunup and stayed until the middle of the week. She said that the family had a get-together that weekend and the previous weekend at least partly because her sister Dolores was moving to New Mexico. She said that Lavergne was driving a blue car but she did not remember the make or model. She knew the date because her sister got her welfare check on the 16th and Lavergne was to take her downtown to do some shopping. She said she had not talked to Lavergne's lawyer but had talked twice to Lavergne while he was in jail. None of the other persons at the party on that weekend testified.

Several policemen testified. Their testimony revealed that none of the stolen items were found in Lavergne's possession. Stolen property was recovered from Oliver, the house where James Hodby, Willie Hodby's brother lived, and from one Daniel Hayes who was arrested but had since disappeared. Nor were any weapons found in Lavergne's possession.

---

[2]Blaylock's fiancee, Carlotta Danials, could not be located at the time of the trial.

Although fingerprints were apparently taken at the clothing store, none were introduced at trial.

There was some identification confusion at the preliminary hearing, but none was involved in the identification of Lavergne himself.[3]

During Oliver's testimony, he mentioned his car several times. On cross-examination, the defense attorney asked him where he got the automobile, a 1968 Cadillac. Over the prosecution's objection he was allowed to answer that he bought it. The defense attorney then asked him if it was stolen, to which he replied that it was not. The defense then sought to impeach Oliver's credibility by introducing testimony to show that the automobile was stolen. His offer of proof included testimony by the owner of the Cadillac that in August he had had the car picked up by a tire company at his place of business, the tires replaced, and the car returned. The tire company employee who picked up and returned the automobile was James Oliver. Shortly thereafter, it was stolen and was not recovered until the arrest of Oliver in September. The judge sustained the prosecution's objection basing its ruling on Evidence Code section 352.[4]

Section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." The trial judge indicated that he excluded the evidence because its probative value was "far" outweighed by the time it consumed and its prejudicial and confusing effect on the jury.

---

[3]Two preliminary hearings were held in tandem, the first for Lavergne and Willie Hodby for the supermarket robbery, the second for Lavergne, Oliver and Blaylock for the Burke's Clothing Store robbery. The witnesses identified Lavergne, but failed to identify Hodby at the first preliminary and the charges were dismissed against him. For some reason he remained seated at the counsel table during the second preliminary and was identified as having participated in that robbery although he had not been charged. At one point, Nellicks also identified Oliver's brother-in-law as one of the robbers rather than Hodby. Moreover, some of the stolen clothes were apparently found in the brother-in-law's possession, but Oliver testified that he had given them to him after the robbery. The defense investigator was unable to locate the brother-in-law. The identity of the parties was further confused by the fact that both Lavergne and Blaylock drove blue Thunderbirds, though Blaylock's was both a deeper blue and newer. For reasons never explained, immediately after the supermarket robbery, the police on the basis of information received over the police radio went to a certain location and found there a blue Thunderbird matching the description of the getaway car. The occupant of the Thunderbird was Michael Blaylock, who was then arrested. The record does not reveal why Lavergne rather than Blaylock was charged with the supermarket robbery.

[4]All code sections herein, unless otherwise designated, are sections of the California Evidence Code.

The Evidence Code provides that all relevant evidence is admissible unless otherwise provided by statute. (§ 351.) Evidence going to the credibility of a witness is relevant evidence. (§§ 406, 780.)

Section 780 of the Evidence Code provides that, except as otherwise provided by statute, the court or jury in assessing the witness' credibility may consider *"any* matter that has any tendency in reason to prove or disprove the truthfulness of [the witness'] testimony. . . ." That section sets forth "a convenient list of the most common factors that bear on the question of credibility." (Law Revision Com. Comment on Evid. Code, § 780.) Among those matters which the jury or judge may consider is the "existence or nonexistence" of *any* fact testified to by the witness. (§ 780, subd. (i).) The nonexistence of a fact testified to is relevant insofar as it is an indication of the witness' general truthfulness and credibility on the witness stand. For this reason juries are instructed, as was the jury in this case, that a witness willfully false in one part of his testimony is not to be trusted in others.

 The evidence the defense sought to have admitted contradicted the testimony of the witness and was therefore relevant and admissible unless the judge found, in the proper exercise of his discretion, that it should be excluded under section 352 or if there was some other specific limitation on the introduction of such evidence. A number of factors support the judge's exercise of discretion in this case.

The defense sought to impeach Oliver on what the trial judge correctly noted was a collateral matter. The fact that the car was stolen had nothing to do with the facts at issue in the trial. Oliver admitted that he used the car in the robbery. How he came to be possessed of the vehicle had no bearing on Lavergne's guilt or innocence and furnished Oliver no motive for falsely implicating Lavergne.

 While collateral matters are admissible for impeachment purposes, the collateral character of the evidence reduces its probative value and increases the possibility that it may prejudice or confuse the jury. The Law Revision Commission notes, in its comment on section 780, that the inflexible rule excluding collateral matters relevant to credibility has been eliminated, but goes on to state that not all evidence of a collateral nature offered to attack the credibility of a witness is thereby made admissible. It refers to the trial court's "substantial discretion" under section 352 to exclude prejudicial and time-consuming evidence. It concludes that the effect of section 780, when read with section 352, is "to change the [then] present somewhat inflexible rule of exclusion to a rule of discretion to be exercised by the trial judge."

California courts have, in cases similar to this one, held the court's exclusion of collateral facts offered for impeachment purposes to be a proper exercise of the trial judge's discretion. In *People* v. *Atchley,* 53 Cal.2d 160 [346 P.2d 764], defendant was on trial for the murder of his wife. Defendant attempted to impeach a prosecution witness by showing that she had forged rent receipts for the deceased to deceive the welfare department after she testified on cross-examination that she never forged a rent receipt. That case, like this one, involved an attempted impeachment of a prosecution witness on a collateral matter involving a crime with which the witness was neither charged nor convicted. In that case we held that the trial court had discretion to foreclose further inquiry into the forgery issue, even for purposes of impeachment.[5] (See also *Garcia* v. *Hoffman,* 212 Cal.App.2d 530, 536-537 [28 Cal.Rptr. 98]; *Eye* v. *Kafer, Inc.,* 202 Cal.App.2d 449, 456-457 [20 Cal.Rptr. 841].) That case would seem to govern here.

██ Two additional factors tend to support the judge's exercise of discretion in the instant case. ██ A witness may have a strong reason to lie about the collateral fact which reason would furnish no motive to lie in his other testimony. Where such a situation exists, the possible inference that a witness false in part of his testimony is not to be trusted as to other parts is weakened. ██ In the instant case, Oliver had apparently not been charged or convicted of the theft of the Cadillac, and thus had a motive to lie about his ownership of the Cadillac which did not exist with respect to his other testimony.

Secondly, it appears that the defendant, on cross-examination, purposely elicited the testimony for the very purpose of impeaching the witness. After Oliver's extensive testimony on direct examination, the first question the defense attorney asked was, "Where did you get that '68 Cadillac you were driving that day?" The witness said that he bought it and when questioned further, stated he bought it from a certain Cadillac dealer. The defense attorney then asked if the car was stolen. It seems apparent that the defense knew the origin of the Cadillac in advance. If the witness answered truthfully that he had stolen the vehicle, the defendant would

---

[5]*Atchley* was decided under the now repealed collateral fact rule set forth in section 1868 of the Code of Civil Procedure. Section 1868 provided: "Evidence must correspond with the substance of the material allegations, and be relevant to the question in dispute. Collateral questions must therefore be avoided. *It is, however, within the discretion of the Court to permit inquiry into a collateral fact,* when such fact is directly connected with the question in dispute, and is essential to its proper determination, or *when it affects the credibility of the witness.*" (Italics added.) The Law Revision Commission Comment to section 780 makes it clear that the law under the new Evidence Code with respect to impeachment on collateral matters remains substantially the same.

██

have had the benefit of the admission of an irrelevant fact which would affect the witness' credibility. But the witness denied it was stolen and defendant now wishes to bring otherwise inadmissible testimony in to impeach him.[6] ■ A party may not cross-examine a witness upon collateral matters for the purpose of eliciting something to be contradicted. (*Rousseau* v. *West Coast House Movers,* 256 Cal.App.2d 878, 887-888 [64 Cal.Rptr. 655]; *Garcia* v. *Hoffman, supra,* 212 Cal.App.2d 530, 536-537.) This is especially so where the matter the party seeks to elicit would be inadmissible were it not for the fortuitous circumstance that the witness lied in response to the party's questions.

■ We conclude, for the reasons stated above, that the trial judge's exclusion of the impeachment evidence was not error. Section 352 permits the trial judge to strike a careful balance between the probative value of the evidence and the danger of prejudice, confusion and undue time consumption. That section requires that the danger of these evils substantially outweigh the probative value of the evidence. This balance is particularly delicate and critical where what is at stake is a criminal defendant's liberty. Nonetheless, it cannot be said that the trial judge's ruling on this evidence, of which the probative value was slight and the chance of prejudice and confusion substantial, struck an improper balance and thereby constituted an abuse of discretion.

■ Even if the judge's ruling were in error in that it constituted an abuse of discretion the error would not have been prejudicial. Nellicks and Johnson, the two victims of the robbery of the clothing store, clearly and consistently identified Lavergne as one of the four robbers. Lavergne knew Blaylock, one of the robbers, his fiancée, and the brother of one of the other robbers. His alibi, while not obviously false, nevertheless contained at least one major inconsistency.[7]

■ Defendant's contention that the prosecutor knowingly used perjured testimony and that the trial judge was biased against him have no basis in the record. The ostensibly perjured testimony was that of Oliver. The record does not compel the conclusion that the testimony of Oliver offered by the prosecution was fabricated or, even if it were, that the prosecutor knew about it. The trial judge did show considerable impatience and irritation with the defendant's counsel but a careful reading of the transcript re-

---

[6]The evidence showing that Oliver stole the Cadillac would constitute "specific instances of his conduct relevant only as tending to prove a trait of his character." Such evidence, unless of a felony conviction (§ 788), is not admissible. (§ 787.)

[7]Lavergne testified that he took Patricia Martin to San Diego on September 14 and returned her to Los Angeles on the 15th so that she could go to work. She, however, had not worked since June.

veals that the judge expressed his feelings almost entirely out of the presence of the jury. Moreover, most of his remarks were directed toward defense counsel's failure to produce his witnesses on schedule. While it appears that the defense attorney was having legitimate difficulties in producing the witnesses, the judge's irritation was understandable. Moreover, it appears that the judge's "bias" was directed toward the defense counsel and not the defendant himself.

In filing his appeal in the instant case, defendant used a form supplied by the Superior Court of the County of Los Angeles. On the form he checked not only the box providing for appeal from the judgment but also the box providing for appeal from an order denying a motion for new trial. The latter order is not independently appealable (Pen. Code, § 1237), and appeals taken from it are ordinarily dismissed. (See, e.g., *People* v. *Haston* (1968) 69 Cal.2d 233 [70 Cal.Rptr. 419, 444 P.2d 91]; *People* v. *Reyes* (1969) 273 Cal.App.2d 769 [78 Cal.Rptr. 733].) The order may, however, be reviewed upon the appeal from the judgment of conviction. (Pen. Code, § 1237); see, e.g., *People* v. *Ambrozic* (1970) 8 Cal.App.3d 867 [87 Cal.Rptr. 899]; *People* v. *Reyes, supra,* 273 Cal.App.2d 769.)

In prior opinions where there is an appeal from the order denying the motion for new trial, we have ordinarily dismissed the appeal from the order. Rule 1 of the California Rules of Court requires us to liberally construe the notice of appeal in favor of its validity, and we are satisfied that the policy reflected by the rule would require us to consider a timely appeal from the order denying the motion for new trial as an appeal from the judgment if there had been no appeal from the judgment. (Cf. *People* v. *Griggs* (1967) 67 Cal.2d 314, 317 [61 Cal.Rptr. 641, 431 P.2d 225] (treating a *coram nobis* petition as a notice of appeal); *People* v. *Gregg* (1968) 267 Cal.App.2d 567 [73 Cal.Rptr. 362] (treating an appeal from the order denying a motion to suppress evidence as a premature appeal from the judgment of conviction).)

The policy in favor of validity and considerations of economy in printing the reports of appellate decisions warrants our treating an appeal from the order denying the motion for new trial as an appeal from a judgment also in those cases where an appeal is taken from the judgment. It will thus be unnecessary to include an order, with or without explanation, dismissing an appeal from the order denying the motion. Although the savings in any one case in deleting a few lines of the opinion would seem insignificant, the numerous cases in which the matter arises would seem to indicate that

substantial savings would result without any injustice or infringement upon the integrity of appellate procedure.

The Attorney General concedes that the judgment should be modified to conform to our decision in *People* v. *Floyd*, 71 Cal.2d 879, 884 [80 Cal.Rptr. 22, 457 P.2d 862].

The judgment of the trial court is modified by adding the words "with a revolver" after the word "armed" and before the word "as" in the fourth line of the second paragraph of the judgment; and by adding the following words to the second paragraph of the judgment: "At the time of the commission of each of said offenses sections 3024 and 12022 of the Penal Code were inapplicable, but defendant was armed within the meaning of section 1203 of the Penal Code." As modified, the judgment is affirmed.

Wright, C. J., McComb, J., Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

Pursuant to order of court filed July 14, 1971, the remittitur theretofore issued in this case was recalled and the opinion and judgment were modified to read as printed above.