[No. B225879. Second Dist., Div. One. Sept. 14, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
KENT MORRISON, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of part II.

**COUNSEL**

Ann Krausz, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Lance E. Winters and Carl N. Henry, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**ROTHSCHILD, Acting P. J.**—A jury convicted Kent Morrison of attempted second degree robbery. On appeal he contends the trial court erred in allowing the prosecutor to impeach him on a collateral matter, the prosecutor committed misconduct in misrepresenting the collateral evidence to the jurors

and his $10 "crime prevention" fine should be vacated. We affirm the conviction and order the fine vacated.[1]

## FACTS AND PROCEEDINGS BELOW

### A.  *The Prosecution's Case-in-chief*

Vicente Hernandez waited for a bus just after midnight at the corner of Vermont Avenue and Venice Boulevard. Hernandez saw a van drive by, make a U-turn, and pull into the strip mall behind the bus stop. Two men got out of the van. One of the men "stared" at Hernandez while the other man, later identified as codefendant Isaiah Young, stood on the corner and "was looking around." Suddenly, Hernandez felt a blow to the back of his head and someone grabbed his hands and pulled them behind his back. The person held Hernandez's hands with one of his hands while he searched Hernandez's pockets with his other hand. The person who did this was not Morrison or Young. When Hernandez called out "the police is coming" the person searching him ran toward the van while the other person remained at the corner. The van drove out of the parking lot.

A passer-by offered to give Hernandez a ride to follow the van and Hernandez accepted. As they pursued the van, Hernandez called 911 and gave a description of the van and the last three numbers of its license plate. A police officer in a patrol car spotted a van that met the description given by Hernandez. After the van ran through two stop signs, the officer ordered it to stop. The officer detained Morrison, who was the driver, and two male passengers. When Hernandez arrived at the scene, he identified all three men as the ones who had been involved in trying to rob him. At trial, Hernandez testified that the van the police stopped was the same van the robbers had used. He identified Young as the "lookout."

### B.  *Morrison's Defense*

Morrison testified in his own defense.

Without objection, he told the jury that he was 25 years of age and, at the time of the charged crime, had for the past year worked as an auto mechanic at Vermont and 103d Street. The van he was driving the night of the alleged attempted robbery was the "work van" that he had been driving for four months and that he sometimes drove home.

According to Morrison, on the night of the alleged robbery he was at home when two friends, Davon and Young, arrived with a third person, Medina,

---

[1] The People agree that the fine was unauthorized.

whom he did not know. Davon wanted a ride to a bus stop so that he could take a bus to visit his girlfriend. Morrison drove Davon to the bus stop in the van that he used in his work. Young and Medina came along. Morrison intended to drive Davon to the bus stop at Vermont and Vernon, which was only a few blocks from his house. From there Davon could take a bus to Vermont and Wilshire, his final destination. When they arrived at the Vermont and Vernon bus stop, a person waiting there told them they had just missed the bus Davon needed to take. Morrison kept driving up Vermont trying to catch up with the bus. When the van's gas light came on Morrison realized that if he continued he would not have enough gas to get home and neither he nor his companions had money to buy gas. Morrison decided to drop Davon at the bus stop at Vermont and Venice. He agreed to wait in the mall parking lot to make sure Davon got on the bus safely.

After a short time, Medina got out of the van to check on Davon. Medina returned five or 10 minutes later, jumped into the back of the van and told Morrison a member of the Playboy gang had pulled a gun on him. While Morrison was trying to decide whether Medina was "just playing," a van drove into the strip mall parking lot "real fast" and Morrison thought it was going to crash into his van. The van pulled up behind Morrison and the driver's door opened. Afraid he was about to be shot, Morrison sped out of the parking lot. The van chased Morrison onto the freeway and down surface streets but eventually he lost it. When Morrison saw that the van was no longer following him he pulled to the curb on a side street and told Medina to get out. Morrison believed the persons in the van chased him because they were after Medina. Moments later a police car arrived and he was arrested.

On cross-examination Morrison testified that he worked five days a week as an auto mechanic for Benny Watkins and that Watkins owned the van he was driving on the night in question. Morrison stated he used the van to pick up parts and occasionally drove it home. He admitted that he did not have a driver's license. The following colloquy took place between the prosecutor and Morrison regarding his use of the van.

"Q. As of the date of this incident [Watkins] was in the process of moving, correct?

"A. No, ma'am.

"Q. Okay. He left that van there parked on Kenwood Street for about one week; isn't that true?

"A. No, ma'am.

"Q. And he left the keys with your family; is that correct?

"A. No ma'am.

"Q. And he gave your family—he asked your family to move the van from one side of the street to the other during when there was street sweeping; isn't that correct?

"A. No, ma'am.

"Q. And he gave permission to your family to borrow the van if they needed [sic] so long as only a licensed driver used the van; isn't that correct?

"A. No, ma'am.

"Q. And he never directly gave you permission to drive that van, did he?

"A. He gave me the keys in my hand."

### C. *The Prosecution's Rebuttal*

Over Morrison's objection under Evidence Code section 352,[2] the trial court allowed the prosecution to call Watkins as a rebuttal witness on the issue of whether Morrison had Watkins's permission to drive the van. The court reasoned that since Morrison had testified that he had permission to drive the van, evidence that he did not have permission was relevant to his credibility.

Watkins testified that he is disabled and has not owned or operated any type of business since 1999. He stated that he owned the van that Morrison was driving on the night of the attempted robbery. He had purchased the van two months before the incident. Watkins explained that he used to live on the same street as Morrison. When he moved from his home three or four weeks before the attempted robbery he left the van parked on the street, gave the keys to Morrison, and asked him to move the van on street sweeping day to avoid getting a ticket. He did not give Morrison any other instructions pertaining to the van.

On cross-examination Watkins testified that for the past 10 years he has been buying cars, fixing them up, and selling them. During the 10 years Watkins bought and sold used cars, Morrison assisted him in repairing those cars. Watkins considered Morrison an auto mechanic. Watkins said he had no "connection to 103rd Street." With respect to the van, Watkins testified he

---

[2] All undesignated statutory references are to the Evidence Code.

gave the keys to Morrison personally and that Morrison had permission to drive the van "at any time of day any day of the week."

On redirect examination the prosecutor asked Watkins, over defense objections, whether he had told a district attorney investigator that he had an agreement with Morrison's mother "to leave the van close to the residence." Watkins denied saying that to the investigator. He both admitted and denied telling the investigator that Morrison's mother could use the van for short trips. Finally, Watkins denied telling the investigator that Morrison was not allowed to drive the van if he did not have a driver's license. The prosecution rested without calling the investigator.

In closing argument the prosecutor maintained that Morrison had lied about his work as an auto mechanic. She pointed out that Watkins refuted Morrison's claim that he worked for Watkins five days a week as a mechanic at 103d Street and Vermont. She also argued that Watkins's testimony showed that he had left the keys to the van with Morrison and Morrison's family so they could move it on street sweeping days and that, contrary to Morrison's testimony, Morrison did not use the van to pick up parts for repairing automobiles and to drive home from work. Because Morrison lied about his employment and the use of the van, the prosecutor argued, the jury should "reject his testimony all together."

## DISCUSSION

I.  *The Court Did Not Abuse its Discretion in Admitting Watkins's Testimony to Impeach Morrison's Claims Regarding His Employment and Use of the Van*

Morrison testified on direct examination, without objection, that he had worked as an auto mechanic at Vermont and 103d Street for a year and that the van he was driving the night of the alleged attempted robbery was his "work van." Over Morrison's objection under section 352, the court permitted the prosecution to call Benny Watkins as a rebuttal witness. Watkins's testimony flatly contradicted Morrison's claims that he worked as a mechanic at a shop at Vermont and 103d Street and that he used the van in that work. On appeal, Morrison argues Watkins's rebuttal testimony should have been excluded under section 352 because "it was prejudicial, confusing and not even marginally relevant." We disagree.

Under the common law, an inflexible rule emerged that a party could not call a second witness to contradict a prior witness on a collateral fact. Thus, if the contradicting testimony was relevant only to the prior witness's credibility it was barred. (Gilligan & Imwinkelried, *Bringing the "Opening the Door"*

*Theory to a Close: The Tendency to Overlook the Specific Contradiction Doctrine in Evidence Law* (2001) 41 Santa Clara L.Rev. 807, 816 (hereafter Gilligan & Imwinkelried).) This rule was reflected in cases such as *People v. Wells* (1949) 33 Cal.2d 330, 340 [202 P.2d 53] in which the court observed: "Neither is it within the proper scope of impeachment to show that a witness has given false testimony as to a matter which could not be proved independently in the case. [Citations.]"

■  California's Evidence Code, adopted in 1965, did away with the common law rule. Section 351 states "all relevant evidence is admissible" and section 780 provides that "in determining the credibility of a witness" the trier of fact "may consider . . . : [¶] . . . [¶] (i) The existence or nonexistence of any fact testified to by him." The effect of these two statutes "is to eliminate this inflexible rule of exclusion." (Cal. Law Revision Com. com., 29B pt. 2 West's Ann. Evid. Code (1995 ed.) foll. § 780, p. 587.) In its place "the court has substantial discretion to exclude collateral evidence" under section 352. (Cal. Law Revision Com. com., 29B pt. 2 West's Ann. Evid. Code, *supra*, foll. § 780 at p. 587.)[3]

■  In *People v. Lavergne* (1971) 4 Cal.3d 735 [94 Cal.Rptr. 405, 484 P.2d 77] our high court explained how the new, flexible rule of collateral impeachment operates. *Lavergne* involved a prosecution for the robbery of a clothing store. One of the robbers who had already pled guilty testified for the prosecution. In the course of his direct testimony the witness mentioned that he drove two of the other robbers to the store in his car. On cross-examination defense counsel asked the witness if the car was stolen. The witness replied that it was not. The defense then sought to impeach the witness's testimony by introducing evidence that the car was stolen. The trial court sustained the prosecutor's objection to this impeachment evidence under section 352. (4 Cal.3d at pp. 739, 741.) The Supreme Court affirmed the trial court's ruling. The court recognized that under the new Evidence Code "collateral matters are admissible for impeachment purposes . . . ." (*Id.* at p. 742.) Nevertheless, the court observed, "the collateral character of the evidence reduces its probative value and increases the possibility that it may prejudice or confuse the jury." (*Ibid.*) Therefore, the court concluded, the admissibility of collateral impeachment evidence is subject "to the trial court's 'substantial discretion' under section 352 to exclude prejudicial and time-consuming evidence." (*Ibid.*, quoting Cal. Law Revision Com. com.)

---

[3] Section 352 allows the court in its discretion to exclude relevant evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

The court found from the particular factors in the case that the trial court did not abuse its discretion in excluding the impeachment evidence. (4 Cal.3d at p. 744.)

■ Admittedly, the evidence of Morrison's employment and how he used the van had no bearing on any issue in the trial and was a collateral fact. Watkins's testimony, however, flatly contradicted Morrison's testimony about where he worked and how he used the van. Therefore, Watkins's testimony was relevant as bearing on Morrison's credibility and was admissible unless it should have been excluded under section 352. (*People v. Lavergne, supra*, 4 Cal.3d at p. 742.)[4]

Although Morrison contends that Watkins's testimony should have been excluded under section 352 he does not support that contention with any explanation of how the testimony consumed an undue amount of time or created a substantial danger of undue prejudice, confusing the issues or misleading the jury. His argument that "before evidence of a false statement is received the trial court must determine whether the falsehood may be reasonably construed as implying an admission of guilt or innocence" is not supported by the cases he cites nor by any other authority. *People v. Kimble* (1988) 44 Cal.3d 480 [244 Cal.Rptr. 148, 749 P.2d 803] and *People v. Fritz* (2007) 153 Cal.App.4th 949 [62 Cal.Rptr.3d 885] had nothing to do with impeaching a witness's collateral testimony with evidence of its falsity. Both cases dealt with the admissibility of false statements to the police by a defendant who did not testify at trial. The cases hold that the statements are admissible as evidence of consciousness of guilt if they are related to the issue of guilt of the crime charged. (*People v. Kimble, supra*, 44 Cal.3d at p. 496; *People v. Fritz, supra*, 153 Cal.App.4th at p. 957.)

Morrison also contends that even though evidence regarding his use of the van came in on direct examination the court should not have allowed the prosecutor to cross-examine him about his use of the van and then impeach that testimony with contrary testimony from Watkins. He cites *People v. McDaniel* (1943) 59 Cal.App.2d 672, 677 [140 P.2d 88], for the proposition that "[l]egitimate cross-examination does not extend to matters improperly admitted on direct examination." His contention fails. *McDaniel* was decided in 1943, before the adoption of the new Evidence Code, and therefore its view of the law regarding impeachment on collateral matters has been

---

[4] The Attorney General argues that Morrison " 'opened the door' " by testifying about his work and permission to drive the van. The notion that such a rule exists has been labeled a " ' "popular fallacy" ' " and rejected by courts and commentators alike. (*People v. Steele* (2002) 27 Cal.4th 1230, 1273 [120 Cal.Rptr.2d 432, 47 P.3d 225]; see Gilligan & Imwinkelried, *supra*, 41 Santa Clara L.Rev. at p. 816; 3 Witkin, Cal. Evidence (4th ed. 2000) Presentation at Trial, § 352, p. 439.) As discussed above, even admissible evidence is subject to section 352.

superseded by statute. (See discussion *ante*, at p. 164.) In any event, Morrison did not object to the prosecutor's cross-examination regarding the use of the van so the issue is forfeited. His argument that the court had a duty to exclude his cross-examination testimony even though his counsel did not object is not supported by the case he cites, *People v. Johnson* (1964) 229 Cal.App.2d 162, 169–170 [40 Cal.Rptr. 105].

II. *The Prosecutor Did Not Unfairly Characterize the Evidence Regarding Morrison's Use of the Van**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is modified to strike the $10 "crime prevention" fine under Penal Code section 1202.5 and is affirmed as modified. The trial court is directed to prepare a corrected abstract of judgment and forward it to the Department of Corrections and Rehabilitation.

Chaney, J., and Johnson, J., concurred.

Appellant's petition for review by the Supreme Court was denied December 14, 2011, S197357.

---

*See footnote, *ante*, page 158.