Filed 5/6/13  P. v. Miller CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B238815 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA359230) |
| v. | |
| ALBERT MILLER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Leslie A. Swain, Judge.  Affirmed.

Barbara A. Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, James William Bilderback II, Joseph P. Lee and Tita Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant and appellant Albert Miller appeals his conviction, by jury trial, of evading an officer with willful disregard, a felony (Veh. Code, § 2800.2, subd. (a)), evading an officer against traffic, a felony (Veh. Code, § 2800.4), and driving with a suspended or revoked license, a misdemeanor (Veh. Code, § 14601.2, subd. (a)). Appellant maintains that a multiplicity of errors in the trial court cumulatively denied him a fair trial. We find no error, and so affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Around 12:30 p.m. on July 8, 2009, Los Angeles Police Officers Minnick and Chavez, who were in a marked police cruiser patrolling the neighborhood around 68th Street and Hoover Street, observed a motorcycle cross their path in a residential area at a speed well in excess of the speed limit. The officers pursued the motorcycle as it drove through the neighborhood, ignoring stop signs and weaving through traffic on narrow streets. The motorcycle did not respond to the cruiser's overhead lights and siren. After following the cyclist on a circuitous route with multiple turns, the officers lost sight of the motorcycle near 59th Place and Hoover.

While they were pursing the motorcycle, the officers radioed their activities to the 77th Street station. Supervisors at the station advised the officers to cease pursuing the vehicle if it was only engaged in reckless driving, and called in a helicopter to take over the pursuit.

A second patrol vehicle driven by Officer Delgado, heard the radio dispatch, spotted the speeding motorcycle, and followed it after it turned from Hoover, going east on Slauson Avenue toward the 110 Freeway. Officer Delgado's unit followed the vehicle as it sped onto the 110 ramp going north.

Additional LAPD units pursued the motorcycle on the freeway with their lights and sirens activated. The motorcycle was weaving through traffic, causing vehicles to brake or swerve to avoid collisions. The motorcycle ended up in the far left lane, traveling at 75 to 80 miles per hour, while the flow of traffic was at 25 miles per hour.

2

Around the Martin Luther King, Jr. Boulevard exit, Officer Delgado radioed that he had lost sight of the motorcycle.

Sergeant Ramirez, listening to the police radio regarding the pursuit, parked on the Vernon Avenue onramp of the northbound 110, approximately one mile south of Martin Luther King, Jr. Boulevard. After less than three minutes, he observed the cyclist driving the wrong way (south) on the collector road to the east of the 110 freeway between the Martin Luther King, Jr. exit and the Vernon Avenue exit.

The motorcycle proceeded the wrong way down the onramp; it stopped when it met Sergeant Ramirez's vehicle. The cyclist laid down the cycle within feet of the patrol car. Sergeant Ramirez unholstered his service revolver, and the cyclist ran up the ramp, across the northbound freeway to the median, south down the median, across the southbound freeway, and ended up in bushes on an embankment on the southbound side of the 110 freeway, near the 49th Street overpass, where appellant was apprehended by another police officer.

Appellant was charged with felony evading an officer with willful disregard, felony evading an officer against traffic, and driving with a suspended license.

Appellant's defense was one of mistaken identity. He testified that he was not the cyclist observed by Officers Minnick and Chavez to be speeding on Hoover Street and observed by Officer Delgado to speed onto the northbound Slauson Avenue onramp, nor did he travel against the traffic on either the freeway or the collector road. Rather, he got on the freeway at 51st Street and was following all traffic laws when a helicopter ordered him to pull over. Appellant further explained that he ran from Sergeant Ramirez because he had been shot in the head the prior year, and "freaked out" when the sergeant pulled his gun. The freeway traffic was at a standstill, so he crossed the freeway to surrender himself to officers he saw on the other side.

Appellant's first trial ended in a hung jury on the two felony counts; he was convicted of driving with a suspended license. On retrial, appellant was convicted of felony evading an officer with willful disregard and felony evading an officer against

3

traffic.  After the jury returned its verdicts, the prior strike and prior prison term allegations were tried to the court, which found all prior conviction allegations to be true.

The court denied the defense request to dismiss certain prior strike convictions, but did limit the sentence to a term doubled for one of the strikes.  Consequently, the court imposed a total term of four years (the two-year midterm, doubled) on the first count of felony evading, and stayed punishment on all other counts and enhancements.

Appellant timely filed a notice of appeal.

CONTENTIONS

Appellant claims that "several significant errors distorted the jury's consideration of his guilt on the two felony counts of conviction."  He cites three such "significant errors:"  (1) The trial court's refusal to permit evidence regarding LAPD's policy regarding car chases; (2) the lack of instructions regarding eyewitness identifications; (3) and the lack of a unanimity instruction.  Appellant concludes that the judgment must be reversed because "this cumulation of errors denied appellant due process and a fair trial, in a manner which meets both state and federal standards of prejudice."  We consider each alleged error separately below.

DISCUSSION

1.      *Evidence of LAPD's policy on police pursuits of vehicles*

Appellant contends that the trial court deprived him of his constitutional right to confrontation when it improperly denied him the opportunity to impeach Officer Minnick with the LAPD policy against high-speed chases.

To put the argument in context, Officer Minnick's supervisors at the 77th Street Station radioed that she was to discontinue the pursuit of the speeding motorcycle if the only offense she observed was reckless driving.  Officer Minnick testified that she had already lost sight of the fleeing cyclist when the supervisor radioed the instruction to discontinue the pursuit.  She further testified that LAPD policy allowed her to pursue a reckless driver, and that her conduct was in compliance with the Department's policy.

4

She stated that officers are "allowed to go on a pursuit of a reckless driver. I believe that watch commander didn't know those facts. The only facts he knew was when he heard the first radio broadcast on Vermont. So he didn't know what had occurred previously." The defense wished to impeach this testimony with the following statement from the LAPD Police Manual published on the LAPD website: "Officers shall not initiate a pursuit based on an infraction, misdemeanor evading, including failure to yield or reckless driving in response to enforcement action taken by department personnel." The prosecution objected, arguing that the LAPD policy was irrelevant, it had little bearing on the officer's credibility, and it would likely confuse the jury regarding the material issues in the case. The trial court excluded the evidence pursuant to Evidence Code section 352, ruling that it involved impeachment on an immaterial issue that would be unduly confusing and time consuming.

We find no error in this ruling. No element of the charged offenses required the prosecution to prove that Officer Minnick or the other officers were acting within the proper discharge of their duties during the pursuit. This made the LAPD policy regarding when officers may or may not pursue a driver irrelevant.

Moreover, the policy which appellant sought to introduce into evidence is subject to multiple interpretations. For instance, it appears to concern only the *commencement* of a pursuit ("Officers shall not initiate a pursuit . . ."), not whether or not a pursuit must be abandoned. Appellant does not contend that Officer Minnick acted contrary to LAPD policy when she followed the speeding motorcycle onto Hoover Street, but that she failed to abandon the pursuit in accordance with LAPD policy. If this interpretation of the policy were accepted, the policy would not impeach Officer Minnick's testimony. Similarly, it could be argued that the proffered policy concerns only a very specific factual circumstance: when an "enforcement action taken by department personnel" (presumably, activating lights and siren, for example) elicits a response from the targeted driver which response constitutes an infraction, misdemeanor evading, or reckless driving. In the absence of this specific factual situation, the policy would not apply. The factual predicates to application of this policy are not present in this case. That is to say,

5

appellant did not speed in response to Officer Minnick's enforcement action, he sped *prior to* her activation of the lights and siren.[1]

On the other hand, appellant's interpretation of the policy could be the correct one. The point is that introducing a one-sentence summary of the LAPD's policy on police pursuits in a case in which the policy has no relevance to the issues to be litigated creates a red herring which has the clear potential to consume undue time and confuse the jury on an immaterial issue. (See, e.g., *People v. Morrison* (2011) 199 Cal.App.4th 158, 164 ["admissibility of collateral impeachment evidence is subject 'to the trial court's "substantial discretion" under [Evidence Code] section 352 to exclude prejudicial and time-consuming evidence.'"].) The trial court properly excluded the evidence.

2. *Eyewitness identification instructions*

Appellant contends that the trial court erred by failing to instruct the jury with CALCRIM No. 315, the eyewitness identification instruction.[2] The argument lacks merit.

---

[1] And what is a "pursuit?" Is it a violation of the policy to follow a driver who has committed one of the specified acts but, while not speeding or driving recklessly, simply waves to the officer and proceeds on his or her way?

[2] CALCRIM No. 315 Eyewitness Identification reads as follows: "You have heard eyewitness testimony identifying the defendant. As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony.

"In evaluating identification testimony, consider the following questions:

"Did the witness know or have contact with the defendant before the event?

"How well could the witness see the perpetrator?

"What were the circumstances affecting the witness's ability to observe, such as lighting, weather conditions, obstructions, distance, [and] duration of observation[, and <insert any other relevant circumstances>]?

Sergeant Ramirez testified for the first time at appellant's second trial that he saw appellant in profile fleeing on foot, and could consequently "facially identify" him. Appellant argues: "[Sergeant Ramirez] explained how no one asked the right question in the 28 months since the incident, to elicit an identification of the traditional sort. This

_____

(continued)

"How closely was the witness paying attention?

"Was the witness under stress when he or she made the observation?

"Did the witness give a description and how does that description compare to the defendant?

"How much time passed between the event and the time when the witness identified the defendant?

"Was the witness asked to pick the perpetrator out of a group?

"Did the witness ever fail to identify the defendant?

"Did the witness ever change his or her mind about the identification?

"How certain was the witness when he or she made an identification?

"Are the witness and the defendant of different races?

"[Was the witness able to identify other participants in the crime?]

"[Was the witness able to identify the defendant in a photographic or physical lineup?]

"[<insert other relevant factors raised by the evidence>.]

"Were there any other circumstances affecting the witness's ability to make an accurate identification?

"The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. If the People have not met this burden, you must find the defendant not guilty."

certainly seemed odd, and it would have been useful for the defense to have eyewitness identification instructions, which would ask the jury to consider factors almost all militating against giving Sergeant Ramirez's late identification much credence."

Because appellant acknowledges that "he was the cyclist who ran from Sergeant Ramirez," his purpose in seeking the identification instruction was not to challenge whether appellant was actually the person Ramirez saw – he admitted he was – but to challenge Ramirez's truthfulness in belatedly identifying appellant. And appellant did not need CALCRIM No. 315 to suggest that Ramirez's late identification of him was suspect. Appellant was free to argue to the jury, as he argues in his appellate brief, that "[i]t strains credulity to suppose than an officer with 21 years experience would not think to mention he could make a facial identification of a suspect, whose face was mostly obscured during salient portions of the events in question." In sum, the trial court did not err in failing to instruct the jury with CALCRIM No. 315.


     3.     *Unanimity Instruction*

Appellant contends that the trial court had a duty to instruct the jury that it was required to unanimously agree on the factual basis for the findings that defendant evaded officers with willful and wanton disregard, and evaded against traffic.

As our Supreme Court has explained, "The key to deciding whether to give the unanimity instruction lies in considering its purpose. The jury must agree on a 'particular crime' [citation]; it would be unacceptable if some jurors believed the defendant guilty of one crime and other jurors believed [him] guilty of another. But unanimity as to exactly how the crime was committed is not required. Thus, the unanimity instruction is appropriate 'when conviction on a single count could be based on two or more discrete criminal events,' but not 'where multiple theories or acts may form the basis of a guilty verdict on one discrete criminal event.' [Citation.] In deciding whether to give the instruction, the trial court must ask whether (1) there is a risk the jury may divide on two discrete crimes and not agree on any particular crime, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is

guilty of a single discrete crime. In the first situation, but not the second, it should give the unanimity instruction." (*People v. Russo* (2001) 25 Cal.4th 1124, 1134–1135.)

Appellant contends that, because the prosecution introduced evidence of more than one act on the part of the appellant which could constitute the offense charged in count 1 (for instance, evidence that appellant perceived and ignored the attempts of two pursuing officers in two separate patrol cars to stop his progress) and count 2 (evidence that appellant drove against traffic both on the freeway and on the connector road) a unanimity instruction was required. We do not agree.

Appellant's flight from pursuit was charged as two separate criminal offenses, covering two discrete time periods: Count 1 focused on appellant's conduct from the time he was first observed to be speeding on Hoover Street by Officer Minnick until Officer Delgado lost sight of him on the freeway. Count 2 pertained to appellant's conduct when he was observed travelling against traffic, near the end of the pursuit.

While there was evidence of various factual bases for a jury finding that appellant was evading an officer (Minnick, Delgado) in willful disregard for safety (speeding, running stop signs), "jury unanimity is not required 'as to the exact way the defendant is guilty of a single discrete crime.'" (*People v. Datt* (2010) 185 Cal.App.4th 942, 950.) Moreover, "[t]here also is no need for a unanimity instruction if the defendant offers the same defense or defenses to the various acts constituting the charged crime." (*People v. Jennings* (2010) 50 Cal.4th 616, 679.) Here, appellant's defense to both count 1 and count 2 was that he did not commit the acts testified to by the officers. Because there was no reasonable basis for the jury to believe that appellant evaded Officer Delgado but not Officer Minnick with willful disregard for safety, or drove the wrong way on the connector road but not on the freeway, a unanimity instruction was not required.

In sum, appellant's argument that the cumulative effect of the trial court's errors deprived him of a fair trial fails, as it is based on the false premise that there were errors. As explained above, none of the assignments of error identified by appellant were in fact errors on the part of the trial court; thus, there was nothing to cumulate.

DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


ARMSTRONG, J.


We concur:


TURNER, P. J.


MOSK, J.