Filed 2/18/16  P. v. Danielson CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>TIMOTHY RALPH DANIELSON,<br><br>    Defendant and Appellant. | D066317<br><br><br>(Super. Ct. No. SCE311994) |

APPEAL from a judgment of the Superior Court of San Diego County, William J. McGrath, Judge.  Affirmed.

Carl Fabian for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Julie L. Garland, Assistant Attorneys General, Charles C. Ragland, Scott Taylor, Kathryn Kirschbaum, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Timothy Ralph Danielson of first degree murder (Pen. Code,[1]

---

[1]    Statutory references are to the Penal Code unless otherwise stated.

§ 187, subd. (a)) and found true that he intentionally and personally discharged a firearm and proximately caused the victim's death (§ 12022.53, subd. (d)). The court sentenced him to 50 years to life in prison. Danielson contends insufficient evidence supports the trial court's finding that an expert witness incorrectly stated the factual bases for his opinion; therefore, the court abused its discretion by admitting rebuttal testimony regarding Danielson's prior act of brandishing a weapon in the presence of his previous wife. We affirm.

FACTUAL BACKGROUND

We need only briefly summarize the facts relating to the shooting because Danielson does not challenge the sufficiency of the evidence to sustain the finding he shot Ming Qi. In his opening brief, he admits he killed the victim: "Appellant was charged and convicted of a single offense, the murder of his ex-wife Ming Qi. Appellant admitted killing Ming Qi, and asserted the lone defense of unconsciousness. The defense contended appellant acted while under a prescription drug-induced psychosis, caused by an anti-smoking medication, Chantix, he had recently started taking. . . . The killing of Ming Qi was immediately followed by appellant's attempted suicide by carbon monoxide poisoning and his hospitalization."[2] The only disputed question was Danielson's state of

_____

[2] In fact, the parties did not oppose the court's decision to instruct the prospective jurors: "And you will hear evidence, I believe that there is no real dispute from either side who fired the rifle that resulted in the death of the victim. This is not a 'who done it.' The brunt of this trial will concern issues surrounding the homicide of this victim, and not who actually did it."

mind when he shot Qi. Accordingly, we set forth those facts necessary to address that issue as well as to support our harmless error analysis on that point.

*Danielson's Testimony*

Danielson and Qi wed in 2006, divorced in 2008, and later resumed living together. Their relationship worsened, and by May 2011, Danielson suspected she was seeing another man. When Danielson protested, Qi said they were no longer married, she could do what she wanted, and Danielson would have to get used to it.

Danielson became depressed and started smoking more cigarettes. In May 2011, he began taking Chantix to help him stop smoking. Danielson testified that after he started taking Chantix he began having suicidal thoughts. But on cross-examination, Danielson admitted that even before he started using Chantix he was experiencing suicidal thoughts. Moreover, he did not take Chantix every day as prescribed.

Danielson went to see a clinical social worker three times in May 2011, but stopped going because the visits were expensive and not covered by insurance. Instead, he returned to an Alcoholics Anonymous meeting, met his former sponsor, and talked to him a total of six or eight times about his problems with Qi.

By June 10, 2011, Danielson had planned to use his electric generator to kill himself within 48 hours. Accordingly, he bought brandy, which he later drank, and stopped taking Chantix. Around that time, Danielson wrote a reminder to himself to take pictures of his generator for a sale advertisement. He explained he wrote that entry "because I wanted this to look like my suicide was accidental" in order that "the insurance would pay."

3

On June 12, 2011, Qi returned to Danielson's home after spending time with a male friend. Qi told Danielson she would move out of his house the next morning. She went for a walk, leaving her bag in the dining room area. Danielson saw in it a pair of male pajama pants, and became upset. When Qi returned home, he fatally shot her six times, his last shot to her head. Danielson felt he was in a dream. He did not call 911.

Danielson decided to hasten his plans to kill himself, and carried his generator upstairs to his bedroom. Danielson moved Qi's body upstairs and put her on his bed. He cleaned her face and threw away some gun casings he found on the floor. He later wrote his sister-in-law an e-mail saying he thought he had killed Qi, he might be insane, and might have a tumor. He telephoned a former girlfriend and left her a voicemail message. He lay down and pointed his gun at his mouth in case someone came into the bedroom. But he did not want to kill himself with a shotgun because it would be messy for anyone who discovered his body. Police discovered him unconscious in the bathroom, and he was taken to the hospital where he was resuscitated.

*Expert Testimony*

Dr. Robert Lantz testified that his laboratory twice tested a sample of Danielson's blood for the presence of varenicline, the main ingredient in Chantix, and even the more sensitive test was negative. Dr. Lantz stated that based on the drug's half life, or the time it takes for its concentration to reduce by one half, if someone started using Chantix on May 19th and stopped using it after one week, there would no longer be any trace of varenicline in his body by June 13th.

4

Psychiatrist Douglas Jacobs testified he reviewed Danielson's medical records and the police investigation in this case, and concluded that virtually all of the factors related to murder-suicide were present. Dr. Jacobs further testified that from his review of the literature, there is no evidence Chantix increases the risk of depression, homicide or suicide, or that when patients stop taking it they suffer mood disturbances. The Food and Drug Administration's "black box" warning for Chantix does not specify that the drug causes neuropsychiatric events that have been reported in patients taking Chantix. Dr. Jacobs disagreed with defense expert psychiatrist Mark Kalish's opinion that Danielson was in a drug-induced psychosis when he murdered Qi. Rather, Dr. Jacobs opined Danielson suffered from severe depression, and Chantix had nothing to do with Danielson's murdering Qi and attempting suicide.

*People's Motion in Limine to Admit Kathleen Barker's Testimony*

The People moved in limine to admit the testimony of Danielson's ex-wife, Kathleen Barker, regarding his brandishing a weapon in her presence in 1988, arguing it was admissible under Evidence Code sections 1101 and 1109. The court denied the motion: "I am perfectly okay with using that incident in the People's rebuttal case, if it becomes open to do so. If, for example, there is some testimony that [Danielson] has never done anything like this. He has never used a gun against anybody. He has never been so upset that he would ever even consider bringing a gun into the equation, anything along those lines is fair game. [¶] But as [Evidence Code, section 1101, subdivision (b)] evidence, its relevance is very weak, if there at all. It's 23 years old. I am not inclined to allow the People to use it."

*Dr. Kalish's Testimony*

Dr. Kalish testified he reviewed Danielson's interview with police, his medical records, Qi's autopsy report and other records, and concluded Danielson suffered from psychosis on the day he shot Qi. Dr. Kalish concluded, "There is no question in my mind that [Danielson] did suffer from a drug-induced Chantix-induced psychotic episode."

Dr. Kalish testified on cross-examination, without objection, about Danielson's risk factors for violence:

"[Prosecutor:] Now in looking through your report, as far as the history of Mr. Danielson, wouldn't you agree that there were many risk factors of violence?

"[Dr. Kalish:] Sure. I mean he is White. He is male. Those are probably two of the biggest risk factors. [¶] He is elderly, that puts him at low risk for this kind of crime. [¶] He has no prior history of any violent acts of this nature. That puts him at low risk. [¶] I mean there are some and there are others that are missing. [¶] I think one thing that is kind of important to look at though, is that he has had—

"[Prosecutor:] Something significant would be his history of depression throughout his life; wouldn't that be significant in looking to a risk factor for violence?

"[Dr. Kalish:] Well, most people that suffer from depression don't have—don't act out violently. It's a rather rare phenomenon. [¶] But looking at Mr. Danielson specifically, he has been suffering from depression his entire adult life and, in fact there has been no same or similar episode.

"[Prosecutor:] And with his history, you are aware that he has also had several hospitalizations that involved suicidal ideation?

6

"[Dr. Kalish:]  Yes, as part of depression.

"[Prosecutor:]  And these suicidal ideations, these hospitalizations involve conflicts with significant others he has had in the past?

"[Dr. Kalish:]  They have in the past, yes, some of them.

"[Prosecutor:]  Correct, some of them."

In light of the above testimony, and over defense counsel's objection, the court granted the People's motion to admit Barker's testimony on rebuttal:  "Well, there certainly has been a similar episode.  If second wife's testimony is that Danielson brandished or showed her a rifle [and] said something about 'what do you think that would happen if I use this?'  That's a similar episode.  It's not the same but it's similar.  [¶] And the jury is left with the impression from Dr. Kalish's incorrect statement that nothing like this has ever happened before.  And while I understand and appreciate completely the seriousness of this evidence coming out, the People are absolutely entitled to allow [Barker] to come in and say that Danielson in 1988, whatever she says he did, brandished a gun and made some statements to her."

The court limited the scope of Barker's testimony and the People's use of it:  "It is only the gun episode that the People will be allowed to impeach with, and not any other acts of violence where he may have pushed her or shoved her or anything like that.  [¶] . . . [¶]  One other thing . . . this evidence cannot be used as propensity evidence by the People in their closing argument.  They cannot argue that if he did this once, and maybe had a gun, was thinking about using the gun, he did it once in [1988], then he must have known what he was doing in 2011."

7

In light of the court's decision to admit Barker's testimony, defense counsel sought a limiting jury instruction regarding the court's ruling. The court agreed and instructed the jury that Barker's testimony "was admitted for the limited purpose of evaluating the basis for the opinion of Dr. Kalish. You may not consider that testimony for any other purpose, including whether or not the defendant is predisposed to commit a crime."

Defense counsel also proposed that as a remedy for Dr. Kalish's testimony, he could be asked whether his opinion would be different if he were aware of the prior incident of brandishing. The court allowed the defense to recall Dr. Kalish and ask him if his opinion would change if he knew that Danielson had a prior episode involving a rifle with a prior wife. But the defense did not recall Dr. Kalish.

Defense counsel also asked the court to exclude Barker's testimony on grounds it was highly prejudicial under Evidence Code section 352. The court replied: "I considered a less intrusive means of addressing this issue by simply ordering that the defense not argue . . . in their closing that Danielson has never had any same or similar episodes. That is just ineffective. The evidence is out. [¶] . . . There is sworn evidence before the jury, sworn evidence, that there have been no same or similar episodes. If I do nothing more than accept the defense's proposition that this is de minimis, it's still out there." The court continued: "I will state for the record that my decision in this regard has been made with a fine appreciation of balancing between probative and prejudicial, and [Evidence Code section 352], in my view, is not something that is going to prevent the court from allowing this to come in."

Defense counsel also asked the court to strike the challenged portion of Dr. Kalish's testimony. The court replied: "Well I am not inclined to do that. I am not going to start striking testimony that was given and then have jurors wonder why it was stricken and what was being stricken. I would have to tell them what was stricken. And it does not seem that satisfies either side's interests in the case."

*Barker's Testimony and the Parties' References to it During Closing Arguments*

Barker's testimony was brief: In 1998, she asked Danielson for a divorce. When she turned around, he was pointing a gun at her from approximately five feet away and said, "I could use this on you." She replied, "Probably. But why would you want to do that?" They stared at each other, and the incident ended when she went into the kitchen to feed her young daughter.

The prosecutor argued to the jury: "And then Dr. Kalish claims that the psychosis—that this is really psychosis because there was no same or similar episodes. Well, in forming his opinion, he fails to consider Kathleen Barker. . . . [She] told [Danielson] she wanted a divorce, and he pointed a rifle at her and threatened her." In arguing that Danielson did not suffer from a drug-induced psychosis, the prosecutor listed evidence pointing to Danielson's clear thinking: he prepared a to-do list; he testified he wanted to stage his death in such a way that it would not appear to be a suicide and therefore his children would benefit from his insurance; he searched Qi's clothes to obtain an idea of where she had gone; and he considered using carbon monoxide to kill her, but decided against it because he would have had to hold her down or tie her down while the carbon monoxide took effect. He confronted her with a loaded gun. After shooting her,

9

he did not call 911 because he believed she was "too far gone"; he cleaned up the blood from Qi after she was dead, and threw away some of the shell casings he had used to kill her. He decided not to use a gun to kill himself because he did not want his family to see him with his head blown off. He sent suicide notes and left voice messages to family members, and took the precaution of shutting his bedroom door because the fumes from the generator could harm police or anyone who entered his bedroom.

Defense counsel explained to the jury that hearsay evidence is used for a limited purpose, elaborating that the prosecutor had asked Dr. Kalish about the risk factors for murder/suicide: "And Dr. Kalish said [Danielson] did not do a similar type of act. [¶] And [the prosecution] brought in Ms. Barker to say 25 years ago, when [Danielson] was at his work bench, she came in and talked about a divorce. Mr. Danielson is alleged, according to Ms. Barker, to have pointed a rifle and said something, and she said something and then she walked out and fed the kids. [¶] You don't use that to determine whether [Dr. Kalish's] opinion is . . . this was such an important fact, that it would affect Dr. Kalish's opinion. It does not, it has no value at all. [¶] And I think if you ever get interested enough in it, if you read Dr. Kalish's opinion, he was talking about the fact of risk factors for murder/suicide, that obviously [if] you attempted murder/suicide before, that would be a high risk factor."

DISCUSSION

Danielson contends the court incorrectly found that Dr. Kalish's testimony provided a basis for Barker's rebuttal testimony, because an expert's testimony may be based on matters not introduced for the truth of the matter stated; further, the admission

10

of Barker's testimony was prejudicial under Evidence Code section 352, an abuse of the court's discretion, and it violated his constitutional right to due process. Danielson claims the prosecutor's closing argument regarding Barker's testimony was misleading, and contends the trial court erred by not striking the challenged portion of Dr. Kalish's testimony and by not applying Evidence Code section 803 to permit Dr. Kalish to state his opinion after excluding from consideration any matter determined to be improper.

A. *Applicable Law*

"Evidence rebutting character evidence is admissible if it relates to a particular character trait defendant has offered in his behalf. The evidence is permissible to undermine the defendant's claim that his good character warrants the jury's exercise of mercy and to present a more balanced picture of that character. The broader the range of the defendant's character evidence, the broader may be the range of the rebuttal evidence, as long as the rebuttal evidence relates to some character trait the defendant has placed into evidence. Whether to admit rebuttal evidence comes within the trial court's discretion, reviewable for abuse of that discretion." (*People v. Cordova* (2015) 62 Cal.4th 104, 141.)

" '[P]roper rebuttal evidence does not include a material part of the case in the prosecution's possession that tends to establish the defendant's commission of the crime. It is restricted to evidence made necessary by the defendant's case in the sense that he has introduced new evidence or made assertions that were not implicit in his denial of guilt.' Restrictions are imposed on rebuttal evidence (1) to ensure the presentation of evidence is orderly and avoids confusion of the jury; (2) to prevent the prosecution from unduly

11

emphasizing the importance of certain evidence by introducing it at the end of the trial; and (3) to avoid 'unfair surprise' to the defendant from confrontation with crucial evidence late in the trial." (*People v. Young* (2005) 34 Cal.4th 1149, 1199.)

" '[R]ebuttal testimony . . . may be proper when it is offered as impeachment to meet evidence on a point put in dispute, i.e., specific statements of fact to which the defense has testified.' " (*People v. Senior* (1992) 3 Cal.App.4th 765, 778 (*Senior*).) In *Senior*, the appellate court upheld the admission of rebuttal testimony where the defendant's "answers on direct examination put in issue whether he had ever used force or threats." The *Senior* court concluded it "was proper to impeach his categorical, blanket denials of threats with evidence of a threat made the same day he denied having threatened the victim with bashing her head and hurting her." (*Ibid.*)

We review a trial court's rulings under Evidence Code section 352 for an abuse of discretion. (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1089-1090.) The trial court "enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time." (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.) The court's exercise of this discretion " 'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*Id.* at pp. 1124-1125.) "As a general matter, the '[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense.' " (*People v. Boyette* (2002) 29 Cal.4th 381, 423.)

12

Therefore the harmless error standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 applies here. (*Boyette,* at p. 424.)

B. *Analysis*

We conclude the court did not abuse its discretion by admitting Barker's testimony on rebuttal. Although Barker's testimony likely portrayed Danielson in a negative light, under Evidence Code section 352, for purposes of finding prejudice, it did not " 'uniquely tend[ ] to evoke an emotional bias against [him], while having only slight probative value with regard to the issues.' " (*People v. Samuels* (2005) 36 Cal.4th 96, 124.) The circumstances surrounding Danielson brandishing the weapon in Barker's presence were sufficiently similar to those of his conviction to support the court's decision to admit Barker's testimony, which was far less inflammatory than the current charges and was directly relevant to the issue of whether Danielson had a prior history of violent acts. (*People v. Morrison* (2011) 199 Cal.App.4th 158, 165.) Specifically, Barker's testimony about the 1988 incident was brief, and in that incident Danielson did not fire a gun, much less commit a homicide or attempt suicide. As in *Senior*, Barker's rebuttal testimony was "made necessary" by Dr. Kalish's testimony that Danielson committed no "same or similar episode." (*People v. Young, supra,* 34 Cal.4th at p. 1199; *Senior,* at p. 778.) We conclude the court did not err by limiting the scope of Barker's testimony and giving the jury a limiting instruction regarding its use of that testimony. Absent some affirmative indication in the record to the contrary, and here there is none, we presume the jury followed the instruction given. (*People v. Holt* (1997) 15 Cal.4th 619, 662.)

13

As to Danielson's claim the prosecutor's argument regarding Barker's testimony was misleading, he did not object to it below and therefore he has forfeited any claim of error. (See *People v. Panah* (2005) 35 Cal.4th 395, 462 [a claim of prosecutorial misconduct is forfeited for defendant's failure to object and request an admonition].) We also note that Danielson's claim regarding Evidence Code section 803[3] is moot because he declined the court's invitation to recall Dr. Kalish to ask him how his conclusion would change in light of Barker's testimony. If Danielson had recalled Dr. Kalish, he would have obviated recourse to Evidence Code section 803.

Moreover, the jury's verdict, based on its finding regarding Danielson's mental state, was supported by expert testimony that there was no measurable trace of Chantix's active ingredient in Danielson's blood after the incident and the "black box warning" for Chantix does not state there is a causal relationship between someone taking the drug and his experiencing symptoms like homicidal or suicidal ideation. And, Danielson admitted he did not take Chantix as prescribed, he was depressed and he had experienced suicidal thoughts before he began using Chantix. The jury also could have reasonably concluded Danielson showed clear thinking in the days and hours up to, during and after the incident: Despite his being a member of Alcoholics Anonymous, he bought brandy to help him get the courage to proceed with his planned suicide; he wrote a list in which he

---

[3]     Evidence Code section 803 states: "The court may, and upon objection shall, exclude testimony in the form of an opinion that is based in whole or in significant part on matter that is not a proper basis for such an opinion. In such case, the witness may, if there remains a proper basis for his opinion, then state his opinion after excluding from consideration the matter determined to be improper.

14

contemplated staging his death such that his family would receive an insurance benefit; he considered but dismissed killing Qi by carbon monoxide inhalation; he shot Qi six times, including a final shot to the head; he e-mailed and called others explaining what had happened; he consciously concluded he did not want to shoot himself and create a mess for his family to clean up; and, he did not want police to be affected by the carbon monoxide in his room. All of these facts undermine the claim that Danielson was suffering from Chantix-induced psychosis when he murdered Qi.

DISPOSITION

The judgment is affirmed.


                                                                    O'ROURKE, J.

WE CONCUR:


HUFFMAN, Acting P. J.


HALLER, J.