Filed 12/3/20  P. v. Garcia CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B301847 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA477275) |
| v. | |
| RICHARD A. GARCIA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Drew E. Edwards and David V. Herriford, Judges.  Affirmed.

Greg Wolff, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Paul M. Roadarmel, Jr. and Michael Katz, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \*

Richard A. Garcia (defendant) was convicted of beating up his on-again, off-again girlfriend, and sentenced to six years in state prison. He argues that his conviction is barred by double jeopardy and is infected with evidentiary error. We conclude none of his claims entitle him to relief, and affirm.

## FACTS AND PROCEDURAL BACKGROUND

### I.    Facts

Defendant and Sandra S. (Sandra) met in 2012, and began an on-again, off-again dating relationship that lasted until July 2019.

In the early morning hours of February 4, 2019, defendant and Sandra got into an argument in an exchange of text messages. Because Sandra wanted defendant to drive her to a court hearing, she went to his house around 8:00 a.m. or 8:30 a.m. that morning. When defendant answered the front door, he started yelling at Sandra and, without provocation, punched her four times in the head and face with his closed fist. He then dragged her by the hair into the house, through the living room, and into the bathroom. Once there, he punched her three more times with his closed fist. The blows knocked her to the floor, and defendant held her to the floor. Defendant then walked out of the room.

Bloodied and stunned, Sandra wiped some of the blood from the injuries to her head and face with the sweater she was wearing before deciding to get into the shower to clean herself up a little. When she finished, she was unable to call 911 because defendant had taken her purse that contained her cell phone, and she was afraid to leave his house because defendant had previously threatened her it "would be . . . worse for [her]" "if

2

[she] left." Exhausted from the beating, she laid down on the bed in the house. It is unclear whether she passed out or fell asleep.

Sandra awoke six hours later (a little before 3:00 p.m.), startled. She ran into the front of the house, and saw defendant out in the front yard. When he left a few minutes later, Sandra ran out of the house, flagged down a passing car, and asked for a ride to her brother's nearby house. Once there, she called 911 to report the beating and, a few minutes later, spoke with a responding police officer who was wearing a body camera.

The beating busted Sandra's lip, bruised her right shoulder and ear, and split her scalp in a way that necessitated two or three stitches.

In a March 2019 back-and-forth exchange on an instant messaging app associated with YouTube, defendant called Sandra a "bitch," a "snitch" and a "fuckn rat," accused her of being "the starter of all fighting," explained that "this is why [she] get fucked up for starting shit," further suggested that the February 2019 beating was Sandra's fault because "If a sign says beware of dog and u still stepp [sic] into the yard . . . then cry n [sic] act like you didn't know youd [sic] get bit," and repeatedly threatened her that he would "beat [her] ass" and "fuck [her] up" when he "get[s] out" of prison.

## II.    Procedural Background

The People charged defendant with (1) injuring a spouse, cohabitant or girlfriend (Pen. Code, § 273.5, subd. (a)), and (2) battery causing serious bodily injury (*id.*, § 243, subd. (d)). As to the injuring a spouse count, the People also alleged that defendant personally inflicted great bodily injury (*id.*, § 12022.7, subd. (e)).

3

The matter proceeded to trial in July 2019. The trial court eventually declared a mistrial.

The matter proceeded to a second trial in September 2019. The second jury convicted defendant of all counts and found true the great bodily injury allegation.

The trial court sentenced defendant to six years in state prison. The court imposed a six-year sentence on the injuring a spouse, cohabitant or girlfriend count, comprised of a three-year base term plus three years for the great bodily injury enhancement. The court then imposed a three-year sentence on the battery count, but stayed the sentence pursuant to Penal Code section 654.

Defendant filed this timely appeal.

## DISCUSSION

Defendant argues that his conviction must be overturned because the trial court erred (1) in declaring a mistrial after the first trial, such that the retrial violated double jeopardy, (2) in not honoring the first jury's request for readback of testimony, (3) in admitting Sandra's statements on the 911 call and to the police who responded to that call, (4) in admitting Sandra's statements from the March 2019 exchange of instant messages, and (5) in admitting evidence that defendant possessed methamphetamine when he was arrested in April 2019.

## I. Issues Relating to First Trial

### A. *Pertinent facts*

On the first day of jury deliberations after defendant's first trial concluded, the jury asked for a readback of the entirety of Sandra's testimony. Because the request came late in the afternoon, the court told the jury it would do the readback the next morning.

4

On the second day of deliberations, one of the jurors was too ill to come to court and the parties stipulated to replace her with an alternate juror. The court then instructed the newly constituted jury that it must "begin [its] deliberations again from the beginning," and "must disregard the earlier deliberations and decide this case as if [the] earlier deliberations have not taken place."

After less than two hours of deliberation, the jury sent a note. The note read:

"We are unable to come to a unanimous decision because we feel that there is insufficient evidence from both the defense and the People. Even with a review of all current exhibits, we all feel strongly about our individual opinions, and they will not change."

In response to the note, the court called the jury to the courtroom and asked how many votes the jury had taken. The foreperson responded, "maybe four." The court explained that because the newly constituted jury had been deliberating for "between an hour and a half, [or an hour and] 45 minutes," it was "going to ask [the jury] to go back and talk some more." The court reminded the jury that it could send a note if the jurors wanted readback.

After less than 90 minutes of further deliberation, the jury sent a second note. The note read:

"We created a timeline and carefully reviewed each piece of evidence again. We cannot agree on a unanimous verdict. We feel that we will be unable to reach a verdict with more time as well. We all feel strongly that there is not enough evidence."

In response to this note, the court again called the jury to the courtroom.  The court again asked how many votes the jury had taken.  The foreperson responded, "Like nine," and added that the jury's split had "[s]tayed the same" in all nine votes.  The court asked, "Without telling me how many people voted guilty and how many voted not guilty, what is the actual split?"  The foreperson responded, "Six to six."  The court then asked whether "there is anything else the court can do to assist [the jury] in reaching a verdict, [such as] additional readback of testimony[ or] any further instructions."  The foreperson responded, "We don't see anything."  The court polled each of the jurors as to whether they believed each "cannot reach a verdict"; all 12 responded they could not.

The court then declared a mistrial and dismissed the jury.

Defendant moved for dismissal of the charges on the ground that "it was an even split as well as the jurors saying there was insufficient evidence."  The trial court denied the motion, explaining that "[h]alf the jurors indicated . . . their belief [defendant] was guilty of the charge" and that it was "well within the People's province to retry this case."

## B.  *Analysis*

### 1.  *Double jeopardy*

The federal and California constitutional guarantees of double jeopardy prevent the People from subjecting a person to a second trial for the same offense(s) unless, as is pertinent here, the first trial was terminated by "legal" or "manifest" "necessity." (*People v. Anderson* (2009) 47 Cal.4th 92, 104 (*Anderson*); *People v. Halvorsen* (2007) 42 Cal.4th 379, 425; *Curry v. Superior Court of San Francisco* (1970) 2 Cal.3d 707, 712; U.S. Const., 5th Amend.; Cal. Const., art. I, § 15.)  There is a legal or manifest

necessity for retrial when the jury in the first case is genuinely unable to reach a verdict. (*Anderson*, at p. 104.) A jury is genuinely deadlocked only if "it satisfactorily appears that there is no reasonable probability that the jury can agree" on a verdict. (Pen. Code, § 1140; *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 462.) "The determination whether there is a reasonable probability of agreement rests in the discretion of the trial court." (*People v. Breaux* (1991) 1 Cal.4th 281, 319.)

The trial court did not abuse its discretion in concluding that there was a reasonable probability that the jury in the first trial could not agree on a verdict (and hence, in concluding that there was no violation of double jeopardy). When the jury first indicated it was deadlocked, the court noted the relatively brief time spent deliberating, ordered the jury to continue discussing the case, and offered to provide any assistance the jury wanted. When the jury later reaffirmed its continued deadlock, the court confirmed that the 6-6 split had not changed after nine votes, and polled each individual juror to confirm that each felt they could not reach agreement. On these facts, the court acted well within its discretion in concluding that there was no reasonable probability the first jury could agree on a verdict.

Citing the language used in the jury's two notes stating that the jury felt there is "insufficient" or "not enough" evidence, defendant argues that what the jury *really* meant was that all 12 jurors felt that there was "not enough evidence" to convict him, or, at a minimum, that the jury was confused about the beyond a reasonable doubt standard. We reject this argument as an unreasonable and implausible reading of the jury's notes. In both notes, the jurors had also expressly indicated that they were "unable to come to a unanimous verdict." What is more, the

foreperson went on to report that "six" jurors had voted "guilty" and "six" had voted "not guilty." Read as a whole, the only plausible interpretation of the jury's representation that there was "not enough evidence" is as an inartful statement that "there is not enough evidence *for all 12 of us to agree on defendant's guilt*" rather than a nonsensical statement that "all 12 of us think there is not enough evidence, including the six of us who still voted guilty." (See *Shoemaker v. Myers* (1992) 2 Cal.App.4th 1407, 1424 ["'Where a statute is susceptible of two constructions, one leading to mischief or absurdity, and the other consistent with justice and common sense, the latter must be adopted'"].) This is particularly so when we consider that the note was written by a juror, and we do not expect jurors to be precise in their use of legal terminology. (Accord, *People v. Riggs* (2008) 44 Cal.4th 248, 287.) The implausibility of defendant's reading of the jury notes also obviated any need for the court to inquire further or to instruct further regarding the burden of proof. Defendant resists this conclusion, citing *People v. Medina* (1980) 107 Cal.App.3d 364 for the proposition that the court should have inquired further, but *Medina* is inapt: There, the trial court was too quick to dismiss a jury that had expressly told the judge it "[n]eed[ed] further instructions." (*Id.* at pp. 368-370.) Here, the jury had repeatedly told the court that it was deadlocked.

2. *Failure to honor request for readback*

When a jury requests the readback of testimony, the court's failure to honor that request can invalidate the verdict. (Pen. Code, § 1138; *People v. Frye* (1998) 18 Cal.4th 894, 1007, overruled in part on other grounds as stated in *People v. Doolin* (2009) 45 Cal.4th 390, 421.) While the trial court did not honor the jury's initial request for readback of Sandra's testimony at

8

the first trial, this was not error.[1]  That is because, on the very next morning before the readback could occur, a new juror was seated.  When this happens, the trial court is required to "instruct the jury to set aside and disregard all past deliberations and begin deliberating anew." (*People v. Collins* (1976) 17 Cal.3d 687, 694, overruled on other grounds as stated in *People v. Boyette* (2002) 29 Cal.4th 381, 462, fn. 19; accord, CALCRIM No. 3575 [so instructing].)  The trial court here did just that.  Thus, the trial court was not required to honor the previous jury's request for readback.  Indeed, it would have been error if the trial court *had* gone ahead with the readback because doing so would have suggested that the prior jury's deliberations—including its requests for readback—still mattered.  (See *People v. Guillen* (2014) 227 Cal.App.4th 934, 1030-1031 [finding error in this context].)  What is more, the trial court told the newly constituted jury that it was free to request any readback, and it decided not to do so.

## II.     Evidentiary Issues

We review a trial court's evidentiary rulings for an abuse of discretion.  (*People v. Jablonski* (2006) 37 Cal.4th 774, 805.)

---

[1]      It is not clear whether this issue is even properly before us given that it deals with the first jury's deliberations (which ended with what we have determined to be a proper declaration of a mistrial) and given that what is before us now are the convictions arising out of the *second* jury's deliberations.

**A.    *Sandra's statements on the 911 call and to the responding officers*[2]**

Sandra's out-of-court statements on the 911 call and to the responding officers regarding what happened when defendant beat her were admitted for their truth, and are accordingly hearsay.  (Evid. Code, § 1200, subd. (a).)

The trial court nevertheless did not abuse its discretion in admitting Sandra's statements because they qualify as excited utterances.  Because these statements were made after a startling occurrence (namely, defendant's attack) and pertain to that occurrence, the sole issue is whether Sandra's statements were the product of "'the nervous excitement'" caused by the beating and made "'before there [was] time to contrive and misrepresent . . . .'" (*People v. Poggi* (1988) 45 Cal.3d 306, 318; Evid. Code, § 1240.)  Factors relevant to this issue include "'[(1)] the passage of time between the startling event and the statement[(s)], [(2)] whether the declarant blurted out the statement or made it in response to questioning, [(3)], the declarant's emotional state and physical condition at the time of making the statement, and [(4)] whether the content of the statement suggested an opportunity for reflection and fabrication.' [Citations.]" (*People v. Sanchez* (2019) 7 Cal.5th 14, 40.)  "'[N]o one factor or combination of factors is dispositive.'" (*Ibid.*)  Although approximately six hours passed between the beating and Sandra's statements on the 911 call and to the responding officers, and although some were in response to

---

2    To the extent defendant challenges the admission of the bodycam footage worn by officers who arrested defendant in April 2019, he does not provide any reasoned argument to support those challenges and they are accordingly waived.  (E.g., *In re S.C.* (2006) 138 Cal.App.4th 396, 408.)

questions posed by the 911 operator and the officer, she spent nearly all of that time unconscious.  More to the point, we have reviewed the 911 tape and the bodycam video worn by the responding officer, and they reflect that Sandra was still under the "excitement" of the beating at the time she made her statements:  She was sobbing on the 911 tape, and the bodycam video shows a battered and bleeding Sandra looking dazed and speaking only haltingly.  (Accord, *People v. Liggins* (2020) 53 Cal.App.5th 55, 61-64 [proper to admit, as an excited utterance, statement recorded by bodycam where video showed declarant was still under stress of event].)

Defendant further argues that we cannot rely upon the excited utterance exception because the trial court never did, leaving us no exercise of discretion to review.  This argument ignores the longstanding rule that ""we review the [trial court's] ruling, not the court's reasoning and, if the ruling was correct on any ground, we [may] affirm."" (*People v. Brooks* (2017) 3 Cal.5th 1, 39.)

### B.    *Sandra's statements in the March 2019 exchange of instant messages*

The People introduced a hardcopy of the March 2019 exchange of instant messages between defendant and Sandra,[3] so defendant's statements during that exchange are hearsay but admissible as the statements of an adverse party.   (Evid. Code, § 1220.)  Sandra's statements during the exchange are admissible to "'provid[e] context' [citation]" for defendant's statements, but

---

[3]    Although defendant repeatedly notes that it was "40 pages" of text messages, it is in actuality 40 pages of blown-up screen shots of text messages, which appear in what must be 22- to 60-point typeface in alternating bubbles occupying only half the page.

in that respect, are not admissible for their truth.  (*People v. Fayed* (2020) 9 Cal.5th 147, 169.)  However, the prosecutor asked Sandra about many of her own statements during her testimony and, in closing argument, referred to those statements as if they had been admitted for their truth.  Defendant forfeited his right to complain of this error, however, because he did not request an instruction limiting this evidence to its nonhearsay uses (Evid. Code, § 355), and did not object to the prosecutor's closing argument (*People v. Crew* (2003) 31 Cal.4th 822, 839).

To forestall any claim that defense counsel was constitutionally ineffective for not requesting a limiting instruction and not objecting, we address that claim.  Even if we assume for the sake of argument that defense counsel's decision not to object was deficient performance rather than a product of trial tactics, defendant has still not established that there is a "reasonable probability" that, but for that deficient performance, "the result of the proceeding would have been different." (*Strickland v. Washington* (1984) 466 U.S. 668, 687, 694.)  That is because the evidence of defendant's guilt was overwhelming and his trial testimony implausible.  The evidence that defendant beat Sandra was overwhelming:  Sandra testified to the beating; her trial testimony was corroborated by her near-contemporaneous statements on the 911 call and to the responding officers; her injuries from the beating were photographed and visible in the bodycam video recorded hours after the beating; and defendant effectively *admitted* to beating her in the instant message exchange and went so far as to threaten to do it again.  Defendant testified, and his defense was not only that *he* did not do the beating, but that he saw Sandra around 8:00 p.m. the same day and that she had no visible

12

injuries. Thus, the defense was that Sandra beat herself up enough to look battered and bruised on the bodycam video at 3:00 p.m., and then used what we must assume to be super-human healing power to appear wholly uninjured five hours later. Given the totality of this evidence, Sandra's statements during the instant message exchange—which at most added a fourth layer of corroboration to her account of defendant's attack—had no discernable effect on the outcome of this trial. Defendant suggests that the fact that the first jury deadlocked and the second jury convicted him means that the instant messages (which were not admitted at the first trial) were necessarily prejudicial. We reject this suggestion, as the admission of those messages were not the only difference between the two trials. (Cf. *People v. Ross* (2007) 155 Cal.App.4th 1033, 1055 [noting that prior jury's deadlock is merely one "fact" to consider in assessing prejudice].)

C. ***Defendant's possession of a substance that appeared to be methamphetamine in April 2019***

1. *Pertinent facts*

The People sought to introduce evidence that, when defendant was arrested for the charged crimes in April 2019, he left a baggie filled with a crystal-like powder in the back of the police vehicle used to transport him. The trial court excluded this evidence in the People's case-in-chief, but noted it might "revisit" the ruling "depending" on what defendant might say during his testimony. Defendant testified. During cross-examination, the prosecutor asked when the defendant last used methamphetamine. Defendant responded that he had not used methamphetamine at all in 2019 or, for that matter, since 2006 or 2007. The trial court then allowed the prosecutor to call the officer who transported defendant in April 2019, and that officer

13

testified that defendant had left a clear plastic baggy with a crystal-like substance in the back seat of the police vehicle, and that the substance appeared to be methamphetamine.

2.    *Analysis*

The trial court did not abuse its discretion in admitting this evidence.  To be sure, whether defendant possessed methamphetamine in April 2019 is collateral to whether he beat Sandra in February 2019.  But "[a] matter collateral to an issue in the action may nevertheless be relevant to the credibility of a witness who presents evidence on an issue." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9 (*Rodriguez*).)  Here, defendant denied using methamphetamine in 2019 while testifying.  Evidence that defendant possibly possessed some methamphetamine in 2019 constitutes evidence regarding "[t]he existence or nonexistence of any fact testified to by [a witness]," and is therefore relevant to a witness's credibility.  (Evid. Code, § 780, subd. (i).)  Admission of this evidence was accordingly entrusted to the trial court's discretion to decide whether its probative value was substantially outweighed by the danger of unfair prejudice.  (*Rodriguez*, at pp. 9-10; *People v. Mendoza* (2011) 52 Cal.4th 1056, 1089-1090; Evid. Code, § 352.)  Here, evidence of defendant's possible possession of methamphetamine in April 2019 had moderate probative value not only to impeach him, but also to corroborate Sandra's testimony that defendant was high at the time he attacked her in February 2019, which helped to explain his seemingly sudden explosion of violence as well as his subsequent misperception of the event.  Conversely, the fact that defendant possessed a substance that looked like methamphetamine two months after the charged offenses did not pose a great danger of unfair prejudice given its minor nature and its lack of a clear link to the

charged crimes. A trial court striking the balance of these considerations in favor of admission does not abuse its discretion.

Defendant's chief response is to cite civil cases and criminal cases that pre-date enactment of the Truth-in-Evidence Law (Cal. Const., art. I, § 28, subd. (f)(2)) for the proposition that "'"[a] party cannot cross-examine his adversary's witness upon irrelevant matters, for the purpose of eliciting something to be contradicted."'" (*Winifred D. v. Michelin North American, Inc.* (2008) 165 Cal.App.4th 1011, 1033; *Bowman v. Wyatt* (2010) 186 Cal.App.4th 286, 327; *People v. Lavergne* (1971) 4 Cal.3d 735, 744.) These cases do not apply in criminal matters because the California Constitution now provides that "relevant evidence shall not be excluded in any criminal proceeding," subject to the trial court's usual exercise of its authority under Evidence Code section 352. (Cal. Const., art. I, § 28, subd. (f)(2); *Rodriguez*, *supra*, 20 Cal.4th at pp. 9-10.) And even if we assumed that this old maxim still applied and that the trial court therefore erred in admitting this evidence, "it is not reasonably probable that a result more favorable to [the] defendant would have resulted" given the overwhelming evidence against defendant, the implausible testimony he provided, and the collateral nature of this evidence to the charged offenses. (*People v. Cole* (2004) 33 Cal.4th 1158, 1195; see generally *People v. Watson* (1956) 46 Cal.2d, 818, 835-836.)

### D. *Cumulative error*

Defendant also argues that the evidentiary errors, considered cumulatively, warrant reversal. In light of our determinations that some of the alleged errors are not errors at all, and that none of them is prejudicial, we further conclude that adding them together is also not prejudicial.

**DISPOSITION**

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
HOFFSTADT

We concur:


_____, P. J.
LUI


_____, J.
ASHMANN-GERST