Filed 1/22/24  P. v. Porter CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B314917 |
| Plaintiff and Respondent, | Los Angeles County |
| v. | Super. Ct. No. BA463024 |
| BRUCE WICKLAND PORTER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Deborah S. Brazil, Judge. Affirmed in part, reversed in part, and remanded with directions.

Robert A. Werth, under appointment by the Court, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Heidi Salerno, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

A jury convicted defendant Bruce Wickland Porter of one count of felony criminal threats and one count of misdemeanor disobeying a criminal protective order. The court sentenced Porter to 11 years in prison, including the high term of three years for the criminal threats conviction, doubled to six years under the Three Strikes Law, plus five years for the prior strike conviction.

On appeal, Porter contends: (1) the court erred by denying his requests to subpoena a witness and various phone and business records and by excluding or limiting other items of evidence that he claims were relevant to his defense; (2) the abstract of judgment must be corrected to reflect the court did not impose any fines and fees; and (3) the matter must be remanded for resentencing because the court improperly relied on one of his prior convictions to impose the upper term for his current criminal threats conviction and to impose a five-year prior strike enhancement.

We agree the matter must be remanded for resentencing and that the inclusion of fines and fees must be struck from the abstract of judgment. On remand, the court shall reconsider Porter's sentence in light of Senate Bill No. 567 (S.B. 567), which amended Penal Code section 1170, former subdivision (b) by making the middle term the presumptive sentence for a term of punishment. (Stats. 2021, ch. 731, § 1.3, adding § 1170, subd. (b)(1) & (2).) We otherwise affirm.

2

# FACTUAL BACKGROUND

### 1. Porter's Relationship with Peggy F.

Porter and Peggy F. met each other online around April 2013, and they soon started dating. At the time, Peggy lived alone with her four-year-old son.

Porter and Peggy went on their first date at a restaurant near Peggy's home in Silverlake, and they took trips to Santa Barbara and Ojai during their relationship. Peggy eventually introduced Porter to several of her friends, her father, and her sister, Clarissa J.

In late December 2013, Porter broke up with Peggy. They saw each other again sporadically in the spring of 2014.

### 2. Porter's Harassment

Around May 2014, Porter began behaving erratically toward Peggy. He sent her several "cryptic" messages and would repeatedly call her over short periods of time. Peggy told Porter he was "scaring" her and that she didn't want to see him again, and she asked him to stop calling her. They didn't speak again for over a month.

In early July 2014, Peggy was working from home when she heard the front door slam shut. She found Porter standing in her living room. He was sweating and smelled like alcohol, and his eyes were glassy. Porter yelled at Peggy and accused her of recording them having sex. Porter claimed he watched a "sex tape" that depicted a woman who looked like Peggy having sex with a man whose wrists resembled Porter's wrists in a house that looked like Peggy's house. Peggy told Porter she didn't know what he was talking about, but she agreed to watch the video, hoping it would convince him to leave.

Later that day, Porter sent Peggy an email with a pornographic video attached, which he claimed showed two people who resembled him and Peggy having sex. Peggy watched several minutes of the video, but she didn't think either of the actors resembled her or Porter. She replied to Porter's email, stating, "I looked at the videos briefly, and aside from her being a curvy girl with natural boobs and him being tall, they look nothing like us, nor does the room they are in look anything like my place. That is just crazy that you could even think that. I don't know what to say, but it's just way out there." Porter replied, "I don't feel crazy. Really not drinking that much. But this morning was totally crazy. I'm sorry. Here's the thing. My bony, broken wrists stand out [in the video]. Isn't my imagination. It's me."

A couple of days later, Porter sent Peggy a series of text messages. He told Peggy that she was "in some trouble" and that he would "get [her] out of that" if she let him "put down whomever needs to get put down." Porter later texted Peggy, "[w]ake up. Tell me I'm totally fucking crazy and I'll check myself into a lollipop factory. … [¶] Otherwise, I've got to fix this. See you in a bit. Okay. 45 minutes." Porter continued to text Peggy, "You know, I don't give a shit about sex tapes, but I think you need help. … [¶] If you need saving, then I've got to save you. Can you tell me what's going on? Sometime this weekend you must tell me again that I'm off my rocker. Otherwise, we'll do this again Monday morning." Worried that Porter might return to her house, Peggy replied, "[y]ou scare me to death, and I don't want any part of it. You are stalking me, and if you come here again, I will call the police."

Around mid-July 2014, Peggy woke up early in the morning to Porter banging on her bedroom window and saying, "It's me. It's me. You need to let me in." As Peggy locked her son in his bedroom, Porter said, "If you don't come out, I need to see you're okay. You need to come to the front door." Peggy then opened her front door and spoke to Porter through a security screen. When she told Porter he needed to leave, he responded, "I'm not leaving. You need to come out. I'm not leaving." After Peggy closed her door, Porter went to the back of her house and continued to bang on her windows. When Peggy threatened to call the police, he called her a "stupid cunt" or a "bitch" and left the house.

Between July and September 2014, Porter sent Peggy around 50 emails. In many of them, Porter attached links to pornographic videos and claimed Peggy and several other people produced and sold hundreds of videos depicting digitally altered versions of him having sex with Peggy or other women.[1] Porter often demanded that Peggy acknowledge she was involved in the production of the videos, and he repeatedly threatened to ruin her reputation and career. In several emails sent between August and September 2014, Porter threatened to kill Peggy, her friends, and the other people he claimed were involved in the supposed video production scheme. Peggy sent several of Porter's emails to the police.

---

[1] Peggy testified that she never filmed or published, or agreed to have others film or publish, videos of herself or anyone else having sex with Porter.

Porter also sent Peggy at least 14 voicemails between July and September 2014. Porter repeatedly threatened to ruin Peggy's, her son's, and her friends' lives; accused Peggy of being involved in a conspiracy to produce and sell videotapes of Porter having sex with her and other women; and demanded that Peggy share with him the proceeds she made from selling the sex tapes.

Porter vandalized Peggy's home on multiple occasions. One day in early August 2014, Porter told Peggy that he was "coming over." Peggy and her son stayed with Peggy's sister that night. When Peggy returned home the next morning, she saw that Porter had burned the letters "WHORE" into her front lawn. A couple of weeks later, Porter threw around 100 pornographic printouts on Peggy's lawn. And in September 2014, after Peggy obtained a permanent restraining order against him, Porter covered Peggy's and one of her friend's cars in red paint and threw two cans of paint through Peggy's living room windows.

In late September 2014, Porter started a text message group with Peggy and several other women he previously dated. In his messages to the group, Porter threatened to kill Peggy several times and accused the women of being involved in a scheme to produce pornographic videos of him. Although Peggy had never spoken to any of the other women before Porter sent text messages to the group, she discovered that he had also been harassing the other women and vandalizing some of their homes.

Porter was arrested around September 2014. He pled guilty to three counts of felony stalking (Pen. Code,[2] § 646.9), one count of felony criminal threats (§ 422), and three counts of felony vandalism (§ 594). The court sentenced Porter to 5 years in

---

[2] All undesignated statutory references are to the Penal Code.

prison and issued a criminal protective order precluding him from contacting Peggy for 10 years.

Porter was released from custody in early 2017.

### 3. Porter's Screenplay

In November 2017, Porter sent Peggy an email that stated: "You feel like talking? Off record. I sorta do. [¶] Otherwise, we'll just leave it to the gods[.]" Porter attached to his email a copy of a screenplay he recently wrote entitled "Amateur Porn."

The screenplay's two main characters, Rob McKenzie and Patsy Greinke, were based on Porter and Peggy, respectively. Most of the scenes mirrored events from Porter and Peggy's relationship, including: their first date at an Italian restaurant near Peggy's house; their trips to Santa Barbara and Ojai; the night Porter met Peggy's friends; and Porter's repeated claims that Peggy, her friends, and other women were involved in a scheme to produce pornographic videos featuring Porter.

Although the final scene of the screenplay was fictionalized, Peggy construed it as a threat of violence against her. In that scene, Rob drives to the desert, where he digs a "grave." Later, he drives a van to Patsy's neighborhood and parks it near her house. Rob, who is in disguise, waits inside the van with a semi-automatic pistol, a roll of duct tape, a box cutter, and a taser. When Patsy and her son return home, Rob parks the van in front of the house, grabs the pistol and taser, and walks toward them. Rob tells Patsy to send her son inside her house.

After Patsy's son walks away, Rob asks Patsy whether they had a "deal," to which she replies, "yes." Rob states, "Okay, here's the new deal. I'd planned on burying you in the desert. Not too far from where I now live. But I'm not really cut out for a killer. But you girls have pushed me right to the edge. … [¶] I'm going

to give you the option. The new deal is that we can still take that ride out to the desert or I can give you something to remember this by." Rob then brandishes a gun and tells Patsy that he "can remove [her] pinkie toe. Like [she] always wanted."[3] When Patsy asks Rob if he's serious, he "jams the gun in her ribs" and says, "I couldn't [be] more serious."

Rob then leads Patsy to her neighbor's lawn, where he forces her to sit down. Rob places the muzzle of the pistol to Patsy's toe, but before he pulls the trigger, he moves the pistol and the bullet misses her foot. Before leaving, Rob tells Patsy, "If I hear one word from the police. If I'm handcuffed over a traffic ticket … I'm gonna kill you, I'm gonna kill your sister. I'm gonna kill Britt, then computer dude, and I'm gonna go down the line until SWAT takes me out. Do you understand?"[4]

Porter was arrested after Peggy forwarded his email and a copy of the attached script to the police.

### 4.    Porter's Testimony

Porter testified at trial. The first act of the screenplay he sent Peggy was based on real events that occurred during their relationship and throughout his life. He based the character Patsy on Peggy and the character Rob on himself. Other characters in the play were based on Peggy's friends and family as well as other women he previously dated. In the first draft of

---

[3] According to Peggy, she once told Porter that she wanted to have a doctor amputate her smallest toe because it caused her pain.

[4] Peggy testified that "computer dude" was based on one of her male friends and that Britt was based on another woman who Porter accused of being involved in the supposed pornographic video-production scheme.

the screenplay, which Porter did not send to Peggy, the final scene did not include any violence. He changed the screenplay's ending shortly before sending it to Peggy because he received feedback from an online review service, which found the original ending he wrote was too "weak."

Porter continued to believe Peggy, some of her friends, and several other women were involved in a conspiracy to produce pornographic videos featuring him. Porter introduced several screenshots from videos he found on the internet, which he claimed included digitally altered versions of him engaging in sexual acts, including having sex with digitally altered versions of Peggy and the other women.

Porter admitted he sent numerous threatening emails, text messages, and voicemails to Peggy and vandalized her home on several occasions in 2014 because he wanted to "scare" her. According to Porter, he violated the first restraining order Peggy obtained against him "dozens of times."

Porter also admitted he violated the 2015 criminal protective order when he sent Peggy the November 2017 email with the screenplay attached. When he sent Peggy a copy of the screenplay, he knew she would recognize the character Patsy was based on her and the character Rob was based on him. Although Porter didn't intend the screenplay to serve as a threat, he wanted Peggy to read the entire thing, including the final scene in which Rob threatened to kill Patsy.

## PROCEDURAL BACKGROUND

The People charged Porter with one count of felony criminal threats (§ 422) and one count of misdemeanor disobeying a court order (§ 166, subd. (a)(4)). The People further alleged that Porter suffered a prior strike and prior serious or

violent felony conviction—i.e., the 2015 criminal threats conviction—under the Three Strikes Law.

Before trial, the court granted Porter's request to represent himself under *Faretta v. California* (1975) 422 U.S. 806. The jury found Porter guilty of both charges, and the court found true the prior conviction allegations concerning Porter's 2015 criminal threats conviction.

At sentencing, the court denied the People's request to strike Porter's prior strike conviction. The court sentenced Porter to 11 years in prison, consisting of the high term of three years for the criminal threats conviction, doubled to six years under the Three Strikes Law, plus five years for the prior strike conviction.

Porter appeals.

## DISCUSSION

### 1.    Denial of the Subpoena Requests

Porter contends the court erred when it denied his requests to issue subpoenas duces tecum to obtain various phone and business records and to subpoena Clarissa, Peggy's sister, to testify at trial. We disagree.

#### 1.1.   Relevant Background

Prior to trial, Porter asked the court to issue a subpoena duces tecum to obtain Peggy's and Bette F.'s[5] cell phone records from 2014 (Phone Records). Porter argued the records could impeach Peggy's and Bette's credibility, as well as the credibility of two other women he accused of being involved in the alleged

---

[5] Porter also accused Bette of being involved in the alleged pornographic video production scheme. She testified at trial.

pornographic video production scheme—Elda M. and Lisa P.,[6] if the records showed those women lied when they claimed they did not meet each other until after Porter was arrested in September 2014. If the Phone Records showed the women lied about when they met each other, Porter argued, the jury could also infer the women were involved in the alleged video production scheme and had lied when they claimed otherwise. If the Phone Records showed Peggy lied about those facts, Porter argued, the jury could also find she lied when she claimed she feared for her safety after he sent her a copy of his screenplay in November 2017.

Porter also asked the court to issue a subpoena duces tecum to obtain business records, including "financial and personnel" information, from Redtube.com, a pornography website (Business Records). Specifically, Porter sought records associated with nine pornographic videos he found on the website that he sent to Peggy in 2014. Porter argued the records could show Peggy and the other women he accused of being involved in the alleged video production scheme produced the videos at issue in his request. The records could also show, Porter claimed, that Peggy and the other women lied about when they first contacted each other. According to Porter, if the Business Records showed Peggy lied about those facts, the jury could infer she also lied when she claimed she feared for her safety after he sent her a copy of his screenplay.

The court denied Porter's request to subpoena the Phone Records "for lack of materiality and lack of a showing of good cause." The court did "not see the relevance of the telephone

---

[6] Elda testified at trial. Lisa did not testify.

records [from] 2014 as having bearing on an event that is alleged to have occurred in this case on or about November 9th, 2017." Alternatively, the court explained, it would exclude the evidence under Evidence Code section 352 because it would likely confuse the jury to "go[] back to phone records [from] 2014 based on a charge that occurred in November of 2017."

The court also denied Porter's request to subpoena the Business Records for lack of "relevance" and "materiality." Even assuming the records proved Peggy and the other women were in contact with each other and participating in a scheme to produce pornographic videos featuring Porter, the court explained, there was a "temporal disconnect" between that evidence and the conduct giving rise to the charges in this case. Specifically, the court found evidence of Peggy's and the other women's conduct in 2014 was not relevant to whether Peggy was in sustained fear after Porter sent her a copy of his screenplay in November 2017.

Porter also moved to subpoena Clarissa to testify at trial. Porter wanted to question her about why she was named as a protected person on the restraining order Peggy obtained around August 2014. According to Porter, Clarissa could testify she was named in Peggy's restraining order because she also was part of the alleged scheme to produce pornographic videos featuring Porter. Porter also wanted to question Clarissa about her income. He claimed Clarissa purchased an expensive car and rented a "luxury apartment," which he believed she could not afford while "working as an admin assistant." Porter opined that Clarissa could testify she made additional money through her role in the alleged video production scheme. Finally, Porter claimed Clarissa could testify Peggy was involved in the alleged pornographic video production scheme, which would show Peggy lied when she

12

claimed otherwise. Like the Phone Records and Business Records, Porter argued, Clarissa's testimony could impeach Peggy's claim that she feared for her safety after he sent her a copy of his screenplay.

The court denied Porter's request to subpoena Clarissa to testify at trial. The court found Clarissa's testimony would not be relevant to any issue at trial. The court also noted that even if Clarissa's testimony was relevant, it would nevertheless exclude that testimony under Evidence Code section 352 because its probative value would be substantially outweighed by the probability it would confuse the jury.

### 1.2. The court did not err in denying Porter's subpoena requests.

Porter argues the court abused its discretion and violated his state and federal due process rights when it denied his subpoena requests. Porter claims the Phone Records, the Business Records, and Clarissa's testimony were relevant for the same purpose—i.e., they could have impeached the credibility of Peggy, Bette, and the other women he accused of being involved in the alleged scheme to produce pornographic videos. Specifically, Porter argues, that evidence would have undermined the witnesses' credibility had it shown they lied about their involvement in the alleged video production scheme and about when they first met each other. Had he been able to use the sought-after evidence to impeach the witnesses' credibility on those issues, Porter contends, he could have materially undermined the People's evidence supporting his criminal threats conviction, especially Peggy's testimony that she feared for her safety after he sent her a copy of his screenplay.

13

As we explain, the court did not err when it denied Porter's subpoena requests. Even assuming the court issued the requested subpoenas and determined the Phone Records, Business Records, and Clarissa's testimony were relevant to show Peggy and the other women lied when they denied involvement in the alleged video production scheme and claimed they first met each other after Porter was arrested in 2014, those facts are collateral to the material, disputed issues in this case, and the court had broad discretion to exclude collateral evidence offered for impeachment purposes.[7] (See *People v. Contreras* (2013) 58 Cal.4th 123, 152 (*Contreras*) [trial courts have broad discretion to exclude evidence offered for impeachment that is collateral to and has no relevance to the action].)

Evidence is relevant if it has some "tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Relevant evidence includes evidence "relevant to the credibility of a witness." (*Ibid*.) Conversely, evidence is "collateral" if it " 'has no relevancy to prove or disprove any issue in the action.' " (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9.) A fact may bear on a witness's credibility and still be collateral to the case. (*Contreras*, *supra*, 58 Cal.4th at p. 152; see, e.g., *People v. Dement* (2011) 53 Cal.4th 1, 50–52 (*Dement*) [inmate who testified for the prosecution about witnessing a prison murder could not be impeached with

_____

[7] Because we assume the records and testimony Porter sought to obtain through his subpoena requests would have established the facts Porter claims they were relevant to prove, and because Porter doesn't argue that evidence was relevant for any other purposes, we focus our analysis on whether the court properly excluded the evidence targeted by Porter's requests.

14

collateral evidence that he had lied in court about his prior murder conviction], disapproved on other grounds in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.)

The trial court has "wide latitude" under state law to exclude impeachment evidence that is collateral and otherwise has no relevance to the action. (*Contreras*, *supra*, 58 Cal.4th at p. 152.) "This exercise of discretion necessarily encompasses a determination that the probative value of such evidence is 'substantially outweighed' by its prejudicial, 'confusing,' or time-consuming nature." (*Ibid*.) Additionally, the exclusion of collateral impeachment evidence does not implicate federal constitutional rights so long "as the excluded evidence would not have produced a ' " 'significantly different impression' " ' of the witness's credibility." (*Ibid*.)

The court did not abuse its discretion when it excluded the Phone Records, the Business Records, and Clarissa's testimony as collateral impeachment evidence. At trial, Porter admitted he wrote the screenplay and sent it to Peggy. Porter also admitted he violated the 2015 criminal protective order when he contacted Peggy in 2017. Thus, as Porter acknowledges, the primary disputed issues in this case were whether: (1) he intended to threaten Peggy when he sent her the screenplay; and (2) whether sending Peggy the screenplay caused her to be in sustained fear for her safety. (See *People v. Toledo* (2001) 26 Cal.4th 221, 227–228 [describing elements of criminal threats].) Evidence that Peggy, Bette, and other women participated in a scheme to produce pornographic videos featuring Porter several years before Porter sent Peggy the screenplay has little tendency to directly prove these disputed issues. If anything, such evidence would support a negative inference about Porter's motive to

15

threaten Peggy when he sent her the screenplay—i.e., he wanted to retaliate for her participation in the video production scheme. As for evidence that Peggy and the other women met each other before Porter was arrested around September 2014, more than three years before the events giving rise to this case, it is not directly relevant to either disputed issue.

To be sure, evidence that Peggy, Bette, or Elda lied about when they met each other or whether they participated in the alleged video production scheme was relevant to assessing their credibility. (See *People v. Lavergne* (1971) 4 Cal.3d 735, 742 (*Lavergne*) [evidence that contradicts a witness's testimony is relevant for impeachment purposes].) But a defendant is not entitled to engage in an unlimited inquiry into collateral matters (*People v. Homick* (2012) 55 Cal.4th 816, 865) or to attack a witness's credibility with "time-consuming and remote evidence that was not obviously probative on the question" at issue (*Dement*, *supra*, 53 Cal.4th at p. 52). Here, it was more than reasonable for the court to conclude the probative value of the Phone Records, the Business Records, and Clarissa's testimony was substantially outweighed by the probability that introducing such evidence would confuse the jury or consume too much time.

As for the probative value of the evidence, it was slight. (See *Lavergne*, *supra*, 4 Cal.3d at p. 742 ["the collateral character of the [impeachment] evidence reduces its probative value"].) There are obvious reasons why Peggy and the other women would lie about their participation in a pornographic video production scheme centered around Porter. They could have wanted to avoid criminal prosecution and protect their professional or social reputations. And, for reasons made clear by Porter's conduct since 2014, they could have wanted to avoid

16

Porter's retaliation. But evidence that Peggy and the other women lied about their participation in the video production scheme has little, if any, tendency to show Peggy lied about fearing for her safety after Porter sent her a copy of his screenplay, especially considering Porter's self-admitted history of threatening and harassing Peggy. (See *id.* at p. 742 ["A witness may have a strong reason to lie about the collateral fact which reason would furnish no motive to lie in [her] other testimony."].)

Additionally, the probative value of the Phone Records, the Business Records, and Clarissa's testimony was substantially outweighed by the likelihood that introducing such evidence would consume too much time and confuse the jury.[8] As for the records, Porter would have needed to introduce numerous documents along with testimony from multiple witnesses qualified to explain the contents of those documents. Such evidence also likely would have confused the jury, as it concerned communications and transactions involving multiple individuals that took place several years before the incident giving rise to this case. While Clarissa's testimony may not have consumed an inordinate amount of time, it was still likely to confuse the jury for the same reasons—i.e., it concerned events significantly predating the incident in this case.

For the same reasons, introducing the Phone Records, Business Records, and Clarissa's testimony would not have caused the jury to have a " ' " 'significantly different impression' " ' " of the credibility of Peggy, Bette, or the other women Porter accused of being involved in the pornographic

---

[8] As discussed more fully below, the court has broad discretion to limit or exclude evidence under Evidence Code section 352.

video production scheme. (*Contreras*, *supra*, 58 Cal.4th at p. 152.) That is, the women may have had strong motives to lie about their roles in the scheme which do not reflect they also had a motive to lie about their reactions to Porter's harassing conduct. (See *Lavergne*, *supra*, 4 Cal.3d at p. 742.) Thus, excluding the Phone Records, Business Records, and Clarissa's testimony did not violate Porter's due process rights.

## 2.    Other Evidentiary Rulings

Porter next contends the court erred when it excluded copies of the first draft of his screenplay and a review of the screenplay's first draft from an online review service. Porter also contends the court abused its discretion when it allowed him to introduce only 10 of around 100 pornographic photographs. We disagree with both contentions.

### 2.1.   Applicable Law

Under Evidence Code section 352, a court has discretion to exclude or limit otherwise relevant evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." We review a ruling excluding evidence under Evidence Code section 352 for abuse of discretion. (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1373.) We will reverse a court's ruling under Evidence Code section 352 when no reasonable judge would have made the same determination as the one on review. (*People v. Clark* (2019) 43 Cal.App.5th 270, 292.)

## 2.2. First Screenplay Draft and Review

Before trial, Porter sought to introduce a copy of the first draft of his screenplay, which included a nonviolent ending. Porter also wanted to introduce a copy of a 10-page review of the first draft of his screenplay, which he obtained from an online review service. The review recommended Porter change the draft's nonviolent ending because it was too "weak." Porter claimed the first draft of his screenplay and the review showed he added a violent ending to the screenplay to increase its appeal, not to threaten Peggy. Thus, Porter argued, the evidence was relevant to prove he lacked the intent necessary to support a criminal threats conviction.

The court ruled Porter could not introduce a copy of the first draft of his screenplay or a copy of the first draft's review, but it allowed him to testify about his "intentions" when he wrote the screenplay because such evidence would "certainly be relevant on [his] state of mind and [his] intent or lack thereof." The court explained that it excluded a copy of the screenplay review because it was not relevant whether "Hollywood people from a website think [Porter's] screenplay was good, poor, needs work or a blockbuster in the making." The court also noted that Porter did not need to introduce a "170-page document [i.e., the first draft of his screenplay] as an exhibit for the jurors to consider … [because his] testimony will be enough."

The court did not abuse its discretion when it precluded Porter from introducing a copy of the first draft of his screenplay or a copy of the draft's review. The court allowed Porter to testify to the same facts he sought to establish by introducing the first draft of his screenplay and its review—i.e., that he originally drafted the screenplay without a violent ending and added a

19

violent ending in response to a reviewer's criticism. (See *People v. Trujeque* (2015) 61 Cal.4th 227, 269 [Evidence Code section 352 allows a court to exclude evidence on the ground that it is cumulative].) In any event, Porter fails to explain how he was prejudiced by the court's decision to exclude copies of the first draft and the draft's review while still allowing him to testify about why he changed the ending of the screenplay's first draft. Thus, any error in precluding Porter from introducing copies of the first draft of his screenplay and the first draft's review was harmless. (See *Trujeque*, at p. 269.)

### 2.3. Pornographic Photographs

Before trial, Porter filed a motion to introduce around 100 screenshots from pornographic videos he found on the internet, which he claimed depicted digitally altered versions of him having sex with Peggy and other women. Porter argued the photographs were relevant to impeach Peggy's and Bette's credibility because they refuted the witnesses' statements denying they were involved in the alleged scheme to produce pornographic videos featuring Porter.

Initially, the court ruled Porter could not introduce the photographs, finding they were not probative of a material issue in the case. In any event, the court explained, it would not permit Porter "to have a mini-trial on the issue of pornography and whether or not [he is] depicted in the[] photographs." The court later changed its ruling, however, allowing Porter to introduce 10 of the proposed photographs at trial.

Like the Phone Records, the Business Records, and Clarissa's testimony, Porter wanted to introduce the pornographic photographs to impeach the credibility of Peggy, Bette, and the other women he accused of being involved in the

20

alleged scheme to produce pornographic videos. Thus, the photographs were collateral impeachment evidence, and the court had broad discretion to limit such evidence. (*Contreras*, *supra*, 58 Cal.4th at p. 152.)

It was more than appropriate for the court to limit Porter to introducing only 10 of the nearly 100 proposed photographs. As we explained above, the probative value of collateral impeachment evidence focused on the alleged pornographic video production scheme was slight. And that probative value was substantially outweighed by the risk that introducing nearly 100 photographs taken from pornographic videos, none of which directly related to the incident giving rise to the charges in this case, would consume too much time and confuse the jury.

### 3.     The abstract of judgment must be corrected.

Porter argues the abstract of judgment erroneously reflects the court imposed more than $800 in fines and fees. The People agree, and so do we, that the abstract of judgment must be corrected because it does not accurately reflect the court's oral pronouncement of sentence.

In a criminal case, the oral pronouncement of a sentence is the judgment. (*People v. Mesa* (1975) 14 Cal.3d 466, 471.) An abstract of judgment, on the other hand, is not the judgment, and it does not control if different from the court's oral pronouncement. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185 (*Mitchell*).) Thus, the abstract of judgment "may not add to or modify the judgment it purports to digest or summarize." (*Ibid.*) To the extent a minute order diverges from the oral record of the sentencing proceedings it purports to memorialize, the deviation is presumed to be the product of clerical error. (*Mesa*, at p. 471.) We may order correction of an abstract of judgment that does not

accurately reflect the oral pronouncement of sentence. (*Mitchell*, at pp. 185–188.)

At sentencing, the court did not impose any fines or fees, finding "good cause to waive [them] in this matter." Porter's abstract of judgment, however, states that the court imposed the following fines and fees: (1) a $400 restitution fine; (2) a $400 parole revocation fine; (3) a $40 court operations assessment; and (4) a $30 conviction assessment. Because the abstract of judgment lists $870 in fines and fees the court did not impose, it must be corrected to remove them. (See *Mitchell*, *supra*, 26 Cal.4th at pp. 185–188.) The court is directed to do so on remand.

### 4.  Dual Use of Facts at Sentencing

Porter next argues the matter must be remanded for resentencing because the court violated section 1170, subdivision (b)(5) when it used his 2015 criminal threats conviction to impose an upper term for his current criminal threats conviction and to impose a five-year prior strike enhancement. The People do not respond to this argument in their respondent's brief. We agree with Porter that the matter must be remanded for resentencing.

At sentencing, the court selected the upper term of three years for Porter's criminal threats conviction. It explained its decision to do so as follows: "The court selects the high term based on [Porter's] prior criminal record, specifically, [he] was convicted by plea of making criminal threats and felony stalking of the same victim in the current case, Peggy [F.]. The contact and current case with Peggy [F.] occurred less than a year … after [Porter] was paroled after his five-year prison sentence for acts of violence and threats against Peggy [F.] in 2014. [¶] The court rejects that low term would be appropriate and rejects that midterm would be appropriate based on the fact that [Porter]

22

engaged in the same conduct, placing [Peggy F.] in no doubt a terrorized state of mind thinking the defendant may have been rehabilitated from his five-year imprisonment and thinking she'd be protected by the criminal order, i.e., that Mr. Porter would follow the orders of the court. None of that occurred as we have evidence of the fact that the defendant was convicted by a jury with all due process rights attached, and the jury found that he, in fact, committed a violation of Penal Code section 422 and a violation of the court order in count 2." The court also used Porter's 2015 criminal threats conviction to double the upper term for his current criminal threats conviction and to impose a five-year prior strike enhancement.

Section 1170, subdivision (b)(5) states that the trial court "may not impose an upper term by using the fact of any enhancement upon which sentence is imposed under any provision of law." Former section 1170, subdivision (b), which was in effect when the court sentenced Porter, included the same prohibition on the dual use of facts to impose a sentence enhancement and an upper term. (See former § 1170, subd. (b).)

As we just noted, the court explicitly relied on Porter's 2015 criminal threats conviction when it imposed the upper term for his current criminal threats conviction. The court also imposed a five-year prior strike enhancement for the same prior conviction. This was error. (§ 1170, subd. (b)(5); see *People v. McFearson* (2008) 168 Cal.App.4th 388, 395 (*McFearson*) [trial court erred when it used defendant's prior conviction to impose an aggravated sentence and a prior prison term enhancement].)

Porter argues the court's error requires us to remand the matter for resentencing. As we noted above, the People do not address this issue. We conclude remand is appropriate. In

imposing the upper term, the court relied on similarities between Porter's 2015 criminal threats conviction and his current criminal threats conviction. Thus, although the court noted it also was relying on Porter's 2015 stalking conviction when it selected the upper term for his current criminal threats conviction, we cannot determine whether the court would still have imposed an aggravated sentence had it not considered the 2015 criminal threats conviction. (See *McFearson*, *supra*, 168 Cal.App.4th at p. 395 [remanding for resentencing because reviewing court could not determine whether trial court would have imposed aggravated sentence without considering improper prior conviction].)

This is especially true considering S.B. 567 went into effect while Porter's appeal was pending. Although the court had broad discretion to select the upper term when it sentenced Porter, S.B. 567's presumption in favor of applying the middle term, which applies retroactively to nonfinal cases like Porter's (see *In re Estrada* (1965) 63 Cal.2d 740, 744–745; *People v. Flores* (2022) 73 Cal.App.5th 1032, 1039), can only be overcome by certain aggravating factors that generally have to be "stipulated to by the defendant, or ... found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (Stats. 2021, ch. 731, § 1.3, amending § 1170, subd. (b); *People v. Flores* (2022) 75 Cal.App.5th 495, 500.) As Porter points out, when it imposed the upper term for his current criminal threats conviction, the court relied on some factors, including the nature and circumstances of that crime and Peggy's vulnerability, that the jury did not find true beyond a reasonable doubt and to which Porter did not stipulate. (See *People v. Boyce* (2014) 59 Cal.4th 672, 728–729 [cautioning that it may be difficult for a reviewing court to

24

conclude with confidence that the same sentencing decision would have been made had the aggravating factors been submitted to the jury].)

In short, we conclude Porter's sentence must be vacated and the matter must be remanded for a new sentencing hearing, at which the court shall reconsider Porter's sentence in light of S.B. 567. (See *People v. Lopez* (2022) 78 Cal.App.5th 459, 465 [S.B. 567's "ameliorative amendments to section 1170, subdivision (b) apply retroactively to all cases not yet final as of January 1, 2022"].)

## DISPOSITION

The sentence is vacated, and the matter is remanded for resentencing consistent with the views expressed in this opinion. The judgment is otherwise affirmed. Upon resentencing, the court shall strike from the abstract of judgment the $870 in fines and fees that the court did not impose, prepare an amended abstract of judgment, and send a certified copy to the Department of Corrections and Rehabilitation.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

LAVIN, J.

WE CONCUR:

EDMON, P. J.

ADAMS, J.

25